**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-2767-WJM-STV

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL NO. 7, AFL-CIO,

    Plaintiff-Counterclaim Defendant,

v.

KAISER FOUNDATION HEALTH PLAN OF COLORADO, and
COLORADO PERMANENTE MEDICAL GROUP, P.C.,

    Defendants-Counterclaim Plaintiffs.

---

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM**

---

    Before the Court is Plaintiff-Counterclaim Defendant United Food and Commercial Workers International Union, Local No. 7, AFL-CIO's ("Local 7" or "Union") Motion for Summary Judgment on Counterclaim ("Motion").  (ECF No. 97.)  Defendants-Counterclaim Plaintiffs Kaiser Foundation Health Plan of Colorado and Colorado Permanente Medical Group, P.C. (jointly, "Kaiser") filed a response in opposition (ECF No. 117), to which Local 7 replied (ECF No. 127).  For the following reasons, the Motion is granted in part and denied in part.

## I. LEGAL STANDARD

    Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[1]

### A.  Collective Bargaining Agreements

Local 7 and Kaiser are parties to two local collective bargaining agreements ("CBAs"), covering different types of medical professionals, with largely analogous provisions. Local 7 and Kaiser negotiated successor agreements in and around Fall 2021, which were ratified on or about December 8, 2021: the Multi-Professional CBA 2022–2026 ("MP CBA 2022–2026") (ECF No. 97-1) and the Mental Health CBA 2022–2026 ("MH CBA 2022–2026") (ECF No. 97-2).[2] The current CBAs have an effective date of October 1, 2021, up to and including April 2, 2026.

---

[1] The following factual summary is largely based on the briefing on the Motion and documents submitted in support thereof. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination. Facts disputed by the parties are noted as such.

[2] Earlier versions of the same CBAs are at ECF Nos. 31-3 (MP CBA 2018–2022) and 31-4 (MH CBA 2018–2022). There is no dispute that in relevant respects, the provisions referred to in the Motion remain unchanged from the previous contracts. *Compare* MP CBA 2018–2022, *with* MP CBA 2022–2026 *compare* MH CBA 2018–2022, *with* MH CBA 2022–2026.

The local CBAs contain an identical article titled "Patient Care" ("Patient Care Article"). The Patient Care Article provides:

> The purpose of this provision is to set forth the understanding reached by the parties with respect to staffing and related issues.
>
> The *parties recognize their mutual and ethical responsibility to provide sufficient staffing* to meet quality standards of patient care, workload, and other issues affecting patient care, including, but not limited to, assuring adequate coverage, sick replacement, overtime, and to assure that no employee is required to work in any situation in which his or her license is threatened or places any employee or patient in danger.
>
> *To that end, Kaiser shall provide sufficient staffing* to address quality of standards of patient care and provider workload including safe coverage.
>
> The parties expressly agree that any disputes arising under this provision of the collective bargaining agreement shall not be subject to the grievance arbitration procedure outlined in Article [23 or 25].

(ECF No. 97-1 at 97; ECF No. 97-2 at 80 (emphasis added).) This language in the Patient Care Article was first negotiated in or around 2000. The Union proposed language that became the Patient Care Article to give the Union a voice in raising issues with Kaiser management related to staffing.

Under the CBAs, with certain contractual limitations, Kaiser alone determines staffing levels for a given department in its facilities. Kaiser allocates staffing based on "full-time equivalent" or "FTE," which is not always synonymous with employee head count because some employees work less than 1.0 FTE (forty hours per week). Kaiser alone determines the FTE assigned to a given department, any changes to a department's FTE, and whether the FTE will be divided among employees working 1.0,

0.9, or other part-time schedules.  After a decision is made, Kaiser consults with Local 7 on how to implement the operational change Kaiser has decided to make.

According to the Union, it, in turn, raises and relays concerns from members about staffing to Kaiser, but Local 7 has no authority or ability to hire anyone to work for Kaiser.  (ECF No. 97 at 5 ¶ 9.)  Kaiser disputes that the Union merely raises and relays concerns; rather, Kaiser states that the Union "has actively opposed Kaiser staffing initiatives . . . and combatively confronted Kaiser on these issues."  (ECF No. 117 at 3 ¶ 9.)

For years prior to October 2021, one of the primary ways the Union raised such concerns was through a jointly administered staffing committee under the local CBAs.  The local staffing committee was comprised of representatives from the Union and Company[3] who reviewed and investigated staffing concerns submitted by Local 7 members.  The local staffing committee, however, was only empowered to investigate concerns and make recommendations to Kaiser to request changes to FTE or other operations; the staffing committee was not empowered to add FTE.  Since the lawsuit was filed in October 2021, Kaiser has refused to engage in the local staffing committee process with Local 7.

The parties dispute Local 7's role and approach in filling open positions, with Local 7 stating that it has offered suggestions to Kaiser to fill open positions, including increasing the number of part-time positions, improving work-life balance initiatives, and sponsoring and advancing programs for workers to get trained for hard-to-fill positions.  (ECF No. 97 at 6 ¶ 11.)  Kaiser characterizes Local 7's approach as demanding that it

---

[3] The Union does not define the term "Company" in its Motion, but the Court presumes it is Kaiser.

simply hire more staff, unrelentingly campaigning for reduced work schedules for work-life balance purposes, complaining about Kaiser hiring temporary workers to add staff, or encouraging employees to pursue legal action to oppose Kaiser's staffing decisions. (ECF No. 117 at 3 ¶ 11.) Kaiser further disputes that the Union sponsors or advances training programs. (*Id.*)

In addition to hiring personnel, Kaiser also makes decisions to reduce and reorganize personnel. The local CBAs outline parameters Kaiser must adhere to when reducing and/or displacing staff and include provisions related to time off. Local 7 has counseled employees on CBA provisions related to time off. The parties dispute whether Local 7 has encouraged employees to misrepresent the reason for an absence from work. (ECF No. 97 at 8 ¶ 14(b); ECF No. 117 at 4 ¶ 14(b).) On one occasion, a Local 7 Union Representative allegedly advised an employee to call in and say he was unavailable to work a shift when he had to attend a court date after Kaiser denied his time off request for that date. On another occasion, a Local 7 Union Representative advised an employee to call and say he was unavailable to work a shift when he was unavailable because he was out of town. However, Local 7 did not encourage the employees to be dishonest about their absences.

**B.     National Agreement**

Separate from the local CBAs, the Union is part of the Alliance of Health Care Unions, a multi-union grouping, which negotiates a "National Agreement" with Kaiser's national and/or parent organization. (ECF No. 52-1.) The National Agreement contains dispute mechanism provisions. The parties dispute whether the "Problem-Solving Processes" outlined in the National Agreement are elective (Union's position) or mandatory (Kaiser's position). (ECF No. 97 at 8 ¶ 16; ECF No. 117 at 5 ¶ 16.)

5

For at least the last thirteen years and through the April 2023 Bernstein deposition, Kaiser has not invoked any dispute mechanism under the National Agreement to address an issue related to staffing.  Kaiser did not invoke any dispute mechanism under the National Agreement to address the issues underlying its allegations in its Counterclaim prior to filing its Answer and Counterclaim.

**C.      Kaiser's Staffing Changes**

Beginning in or around mid-2018 through late 2019, Kaiser representatives and consultants facilitated a massive restructuring of its Colorado operation through a process called the transformation.  Kaiser reorganized its operations and drastically reduced staff, causing approximately twenty percent of its non-physician workforce to lose their jobs.  Kaiser clarifies that there were no involuntary targeted layoffs; rather, Local 7 employees were given three options to remain employed: (1) "[d]uring the notice period of potential layoff/displacement, they could be placed into an open position for which they qualified, almost qualified, or would qualify within 90 days"; (2) "[t]hey could displace or bump less senior employees in their job classification"; or (3) "[t]hey could move into transition status under the parties' Employment and Income Security Agreement ("EISA"), which allows an employee to remain employed for one year with full pay and benefits, during which time they could choose to be recalled into other vacant positions in their field for which they qualified."  (ECF No. 117 at 5–6 ¶ 19(a).)  Employees who chose not to remain employed at Kaiser during the transformation, could and did elect instead to accept an "enhanced severance" that offered 12 months of pay and full benefits, double the six months of severance guaranteed to separating employees in the parties' 2018 Local CBAs.

According to the Union, while the transformation resulted in cost savings for

Kaiser, almost immediately concerns were raised—although it is unspecified who raised the concerns, but it appears to be the Union—about the long-term sustainability of the changes.  (ECF No. 97 at 10 ¶ 20.)  Kaiser again states that the Union "actively opposed" its staffing initiatives and "combatively confronted Kaiser on these issues."  (ECF No. 117 at 7 ¶ 20.)

The Union states that in or around 2019, without consulting with or advising the Union, Kaiser decided to require many Primary Care employees to work in full-time status (1.0 full-time equivalent) although many of the unionized workforce in the department had previously worked part-time.  Kaiser states that it had discussions with the Union in December 2018 about Primary Care business.  The Union disagreed with—or, according to Kaiser, opposed—Kaiser's decision to force long-term part-time employees to convert to full-time positions.  The Union opposed the decision to move Primary Care and other employees to full-time status because the Union believed it would exacerbate, not improve, staffing issues.

Subsequently, in or around 2020 and 2021, again without consulting with or advising Local 7, Kaiser allegedly decided to force Urgent Care employees to work in full-time status.  The Union again disagreed with Kaiser's decision to force long-term, part-time employees to convert to full-time positions.  Kaiser decided to force employees to work at 1.0 FTE to stretch its current resources to provide additional coverage.  The Union states that Kaiser's decision was based on a determination that it would not hire additional staff, but Kaiser states that although cost was a factor, it made its decision partly to ensure continuity of patient care.

Local 7 voiced to Kaiser its concern that this shift would increase burnout and

7

turnover, thus creating more staffing issues.  Kaiser is aware that overworking providers, including forced mandatory full-time work, can drive down provider engagement and the quality of care provided to patients.

Kaiser has required Local 7 employees, including pharmacists, to work at multiple facilities across Colorado.  Local 7 disagreed with—or, according to Kaiser, opposed—Kaiser's efforts out of concern for the potential detrimental impact on affected employees, and in turn staffing.  The parties dispute whether forcing employees to work at different facilities violates the local CBAs.  (ECF No. 97 at 12 ¶ 24(b); ECF No. 117 at 8 ¶ 24(b).)  Based on feedback from members, Local 7 advocated against these FTE and multi-facility changes to improve work-life balance and promote more sustainable careers, believing it would improve staffing overall.

According to Kaiser, the Union "constantly has asked for a greater number of less-than 1.0 FTE positions, and Kaiser would have considered it—a win for Local 7 nurses—if the Union had been open to prorating benefits.  But the Union has refused to discuss or support prorated benefits."  (ECF No. 117 at 15 ¶ 30.)  From Kaiser's perspective, in other words, the Union was unwilling to even consider negotiating terms that might have led to an agreement on the issue of FTE positions.  The Union states that it made proposals during bargaining and has otherwise suggested to Kaiser to increase the number of less-than 1.0 FTE positions, but according to the Union "[a]t no point in at least the last thirteen years has Kaiser submitted a proposal during negotiations to prorate health insurance benefits or modify the provision granting employees who work three 12-hour shifts all contractual benefits of a 1.0 FTE employee."  (ECF No. 127 at 10 ¶ 30.)

**D.     State Board of Nursing Complaints Against Kaiser Executives**

Union Representative Leah Dowodzenka filed six complaints with the Colorado State Board of Nursing ("SBON") between 2019 and 2022 against Kaiser executives and managers, including: former Chief Nursing Officer ("CNO") Dr. Sara Kollman, RN, Ph.D.; Vice-President of Care Continuum Cortney Eisses, RN (Acting CNO and Regional Administrator of Medical Specialties at the time complaint was filed); Senior Director of Operations for Perioperative Services Kristen O'Keefe, RN; Senior Director of Operations for Float Pool and Regional Staffing Office Pegah Rownaghi, RN; and Population Department Manager Martina Kuhar, RN.  (ECF Nos. 113-17–113-22.)  The parties dispute the reasons for which these complaints were filed, with the Union stating that Dowodzenka filed the complaints hoping for an external intervention and investigation into Kaiser's practices in light of concerns raised to her by Kaiser practitioners/Local 7 members.  (ECF No. 127 at 5 ¶ 4.)  By contrast, Kaiser states that the Union filed the complaints because of its opposition to policies or workflow processes and protocols that Kaiser implemented.  (ECF No. 117 at 10 ¶ 4.)

Dowodzenka testified that filing a SBON complaint against a licensed provider is a serious charge that could affect a person's livelihood and acknowledged that facing a SBON complaint could be intimidating.  The parties dispute the reasons for which the SBON complaints were filed.  Kaiser asserts that none arose from allegations concerning inadequate staffing or because the employee was required to work in a license-threatening situation.  (ECF No. 117 at 12 ¶ 12.)  However, the Union states that the allegations could "result from inadequate department staffing—practicing outside of scope . . . and practicing to the standard of care."  (ECF No. 127 at 7 ¶ 12.)  Further, the Union's witness could not rule out whether the complaints might relate in some manner

9

to adequate staffing and/or safety. (*Id.*)

The Union disputes Kaiser's assertion that the complaints were not made to identify legitimate concerns about violations of nursing practices, but rather to escalate ongoing conflicts between Union leadership and Kaiser management over workflow and efficiency issues that were being discussed in the normal course of collective bargaining. (ECF No. 117 at 12 ¶ 14; ECF No. 127 at 7 ¶ 14.) All of the SBON complaints were dismissed because there "were insufficient grounds to warrant the commencement of formal disciplinary proceedings."

**E.     Union Rally**

The Union held a "Rally to Save Patient Lives" at the State Capitol the day before it filed this lawsuit. Kaiser contends the rally criticized its management and staffing initiatives. (ECF No. 117 at 16 ¶ 33.) However, the Union characterizes the purpose of the rally as voicing concerns about the lack of action and initiatives by Kaiser related to staffing. (ECF No. 127 at 10 ¶ 33.)

### III. PROCEDURAL HISTORY

The Union filed its Complaint on October 14, 2021. (ECF No. 1.) The First Amended Complaint was filed January 13, 2022, alleging one claim for breach of contract under 29 U.S.C. § 185. (ECF No. 32.) The Union alleges that Kaiser has failed to adhere to its obligations under the Patient Care Article to "provide sufficient staffing to address quality of standards of patient care and provider workload including safe coverage." (*Id.* ¶ 51.) The Union requests declaratory and injunctive relief, specifically: that the Court declare Kaiser to be in breach of the Patient Care Article of the relevant local CBAs and enter a permanent injunction requiring Kaiser to increase staffing at its facilities and maintain adequate staffing in compliance with the parties'

agreements.  (*Id.* at 18.)

Kaiser filed its Answer and Counterclaim on October 21, 2022, alleging one claim for breach of contract.  (ECF No. 52.)  Kaiser alleges that the Union "was obligated to assist Kaiser in resolving staffing related issues" under the Patient Care Article.  (*Id.* ¶¶ 23–24.)  Kaiser alleges the Union has failed to adhere to its obligations under the CBAs.  (*Id.* ¶ 26.)  Kaiser requests that the Court declare the Union "to be in breach of the [CBAs]" and compel the Union to "specifically perform its obligations under the collective bargaining agreements: (i) to provide sufficient staffing to meet the quality standards of patient care, workload, and other issues affecting patient care, including, but not limited to, assuring adequate coverage; (ii) to submit such issues to the appropriate dispute mechanism; and (iii) such other and further obligations under the applicable collective bargaining agreements which the Union has breached as proven at trial."  (*Id.* at 18.)

## IV. LAW

In Colorado, the elements for a breach of contract claim are: (1) existence of a contract; (2) performance by plaintiff or some justification for nonperformance; (3) failure to perform the contract by defendant; and (4) damages to plaintiff.  *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).

The interpretation of a written contract is generally a question of law.  *Matter of May*, 756 P.2d 362, 369 (Colo. 1988) (en banc).  "Under Colorado law, the purpose of contract interpretation is to ascertain the intent of the parties by ensuring that contracts are construed 'consistently with the well-established principles of interpretation.'"  *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1059–60 (D. Colo. 2013) (quoting *East Ridge of Fort Collins, LLC v. Larimer and Weld Irrigation*

*Co.*, 109 P.3d 969, 973 (Colo. 2005)).  As a starting point, courts examine the contractual terms and attempt to determine the parties' intent therein.  *Id.* (citing *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008)).

When construing a contract, courts must not "view clauses or phrases in isolation."  *Id.* (quoting *East Ridge*, 109 P.3d at 974–75).  This principle guards against a reading of the contract that would yield an absurd result—and run inconsistent with the purpose of the contract.  *Id.* (citation omitted).  Courts must examine the contract as a whole and attempt to determine the intent by reference to all of the contract's terms and provisions.  *Liebert*, 535 F.3d at 1154; *East Ridge*, 109 P.3d at 973.

Whether a written contract is ambiguous is a question of law.  *Id*.  When a contractual term "unambiguously resolves the parties' dispute, the interpreting court's task is over" because "in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence."  *Id*.  A contract is ambiguous "if it is fairly susceptible" to more than one interpretation.  *Id*.  In determining whether an ambiguity exists, the "language of the agreement must be construed by application of the accepted meaning of the words with all reference to its provisions," and the "nature of the transaction which forms the contract subject matter must also be considered."  *In re Marriage of Thomason*, 802 P.2d 1189, 1190 (Colo. App. 1990).

## V. ANALYSIS

### A.  Patient Care Article

The Union concedes that Kaiser has satisfied the second and fourth elements of its Counterclaim for breach of contract.  (ECF No. 97 at 14–15 (stating Kaiser has insufficient evidence to support the existence of an agreement and/or any breach by Local 7).)  Therefore, the Court only considers the elements of a breach of contract

12

claim concerning whether a contract exists and, if so, whether it has been breached.

1.   The Existence of a Union Obligation

The Patient Care Article states in full:

> The purpose of this provision is to set forth the understanding reached by the parties with respect to staffing and related issues.
>
> *The parties recognize their mutual and ethical responsibility to provide sufficient staffing to meet quality standards of patient care, workload, and other issues affecting patient care, including, but not limited to, assuring adequate coverage*, sick replacement, overtime, and to assure that no employee is required to work in any situation in which his or her license is threatened or places any employee or patient in danger.
>
> *To that end, Kaiser shall provide sufficient staffing* to address quality of standards of patient care and provider workload including safe coverage.
>
> The parties expressly agree that any disputes arising under this provision of the collective bargaining agreement shall not be subject to the grievance arbitration procedure outlined in Article [23 or 25].

(ECF No. 97-1 at 97; ECF No. 97-2 at 80 (emphasis added).)

In the Counterclaim, Kaiser alleges:

> 22. Kaiser and the Union are party to a series of agreements, including the National Agreement, Multi-Professional Local Agreement and the Behavioral Health Local Agreement.
>
> 23. Under the Multi-Professional Local Agreement and the Behavioral Health Local Agreement, the Union is obligated to, *inter alia*, provide "sufficient staffing to meet the quality standards of patient care, workload, and other issues affecting patient care, including, but not limited to, assuring adequate coverage, sick replacement, [and] overtime, . . . ."
>
> 24. Under these agreements, the Union was obligated to assist Kaiser in resolving staffing related issues.

13

> . . .
>
> 26. The Union has failed to adhere to these obligations under the CBAs.
>
> 27. As a result of the Union's breaches, Kaiser has suffered damages flowing from the Union depriving Kaiser of the benefits of the bargain represented by the CBAs' Patient Care Clause and the National Agreement.

(ECF No. 52.)

Determining whether the Union has an obligation to assist Kaiser in resolving staffing related issues in this case is a *very* close call. Nevertheless, the Court concludes that the Patient Care Article is unambiguous and needs no extrinsic evidence to interpret it.

The second paragraph of the Patient Care Article clearly states that *both* parties have a "mutual and ethical responsibility to provide sufficient staffing." Using the phrase "[t]o that end," the third paragraph clarifies that to effectuate paragraph two, it is *Kaiser*'s obligation to "provide sufficient staffing." In other words, Kaiser alone can hire, fire, or lay off staff. The parties do not dispute that under the CBAs, with certain contractual limitations, Kaiser alone determines staffing levels for a given department in its facilities. (ECF No. 97 at 5 ¶ 8; ECF No. 117 at 3 ¶ 8.)

Nevertheless, the Union places too much emphasis on paragraph three at the expense of ignoring the importance of paragraph two. A contract must be interpreted to give effect to "every word, phrase, clause, and sentence," if possible. *Cities Serv. Gas Co. v. Kelly-Dempsey & Co., Inc.*, 111 F.2d 247, 249 (10th Cir. 1940). Under paragraph two, *both* parties undertake a mutual responsibility to provide sufficient staffing, with specific language explaining what issues could conceivably arise in that context.

14

Moreover, in the Counterclaim, Kaiser alleges that the Union failed to assist Kaiser in resolving staffing issues—*not* that it failed to hire, fire, or undertake other specific human resources-related staffing actions.  This distinction is critical because it contemplates the "mutual" duties imposed on both parties under paragraph two, rather than the more specific duties imposed on Kaiser alone under paragraph three.

The Court agrees with Kaiser's characterization of the issue, namely, that an undue focus on paragraph three "misses the point" because Kaiser's staffing obligation "does not negate the parties' contractual duties or somehow imply that there is nothing the Union can do to advance the parties' mutually expressed interest in safe staffing." (ECF No. 117 at 22.)  Therefore, the Court concludes that the Patient Care Article of the CBAs obligates the Union to work in tandem with Kaiser to provide adequate staffing to meet the demands of providing appropriate patient care.

2.  Breach of the Patient Care Article

While the Court concludes as a matter of law that the Patient Care Article creates a duty for Kaiser and the Union to work in tandem to provide sufficient staffing, at this juncture of the litigation, it cannot make a similar finding with respect to the question of whether the Union has breached the CBAs' Patient Care Article.  Instead, the Court finds that genuine disputes of material fact remain as to whether the Union's actions violated its "mutual and ethical responsibility" to assure "adequate coverage," among other things, under the CBAs.

Such factual disputes—detailed in the Material Facts section, *supra*, Part II—include Kaiser's contention that the Union breached its obligations by "fighting Kaiser's attempts to staff its facilities at every turn, such as encouraging employees to use sick time to call off when they are not sick, opposing Kaiser's attempt to turn part time

15

positions into full time positions, resisting Kaiser's attempt to move employees to different facilities to cover short staffing situations, and refusing to agree to an economically viable benefits proposal to facilitate hiring of additional part time staff." (ECF No. 117 at 19.) Additional disputes arise from Kaiser's complaints that "the Union has proposed no cooperative solutions—only complaints—to address staffing shortages and has opposed Kaiser at every step and on every issue involving staffing, going so far as to threaten the professional licenses of Kaiser executives with meritless State Board of Nursing complaints." (*Id.*)

On this record, therefore, the Court cannot conclude as a matter of law whether the Union has, or has not, met its responsibilities under the Patient Care Article. Such factual disputes can only be resolved following full development of the record at trial. Accordingly, the Court denies this portion of the Motion.

**B.     National Agreement**

In the Counterclaim, Kaiser also alleges that "[u]nder the National Agreement, the Union was obligated to follow the grievance procedures laid out in the "Problem-Solving Processes" section to address any issues or disagreements at the facility level which arises out of the interpretation and/or implementation of Section 1 of the National Agreement." (ECF No. 52 ¶ 25.) Additionally, Kaiser alleges that "[a]s a result of the Union's breaches, Kaiser has suffered damages flowing from the Union depriving Kaiser of the benefits of the bargain represented by the CBAs' Patient Care Clause and the National Agreement." (*Id.* ¶ 27.)

In the Motion, the Union argues that Kaiser cannot prove a breach of the National Agreement. (ECF No. 97 at 24–25.) It elaborates in its reply that "it is not clear" whether any such breach of the National Agreement is alleged in the Counterclaim, and

16

"Kaiser's failure to address this in its response brief suggests no such claim is alleged." (ECF No. 127 at 3 n.7.)  Further, the Union asserts that "Kaiser has utterly failed to articulate any reason why the Court should not grant summary judgment against Kaiser to the extent its counterclaim alleges a breach of the National Agreement."  (*Id.*)

Other than denying Facts 16(a) and (b) in its response brief, Kaiser did not address the Union's argument concerning the National Agreement.  The Tenth Circuit has stated that "[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.'" *Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)); *see also United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013) (cursory argument not meaningfully developed by any analysis or citation is deemed waived).  The Court concludes that to the extent any such breach of the National Agreement is in fact alleged in the Counterclaim, Kaiser has waived this argument.  Therefore, the Court grants summary judgment with respect to any purported allegations in the Counterclaim related to the Union's breach of the National Agreement in favor of the Union and against Kaiser.

## VI. CONCLUSION

For the reasons set forth above, the Court ORDERS:

1. Local 7's Motion for Summary Judgment on Counterclaim (ECF No. 97) is GRANTED IN PART AND DENIED IN PART, as set forth above; and

2. This case REMAINS SET for a 9-day bench trial beginning on **January 13, 2025 at 8:30 a.m.** in Courtroom A801, and the Final Trial Preparation Conference

17

REMAINS SET for **January 3, 2025 at 10:00 a.m.** (ECF No. 136).

Dated this 17th day of June, 2024.

BY THE COURT:

_____
William J. Martínez
Senior United States District Judge