## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
**Judge William J. Martínez**

Civil Action No. 21-cv-2767-WJM-STV

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL
NO. 7, AFL-CIO,

      Plaintiff-Counterclaim Defendant,

v.

KAISER FOUNDATION HEALTH PLAN OF COLORADO, and
COLORADO PERMANENTE MEDICAL GROUP, P.C.,

      Defendants-Counterclaim Plaintiffs.

---

## ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING RULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendants-Counterclaim Plaintiffs Kaiser Foundation Health Plan of Colorado ("KFHP") and Colorado Permanente Medical Group, P.C.'s ("CPMG") (jointly, "Kaiser" or "Defendants") Motion for Summary Judgment ("Motion").  (ECF No. 98.)  Plaintiff-Counterclaim Defendant United Food and Commercial Workers International Union, Local 7, AFL-CIO ("Local 7" or "Union") filed a response in opposition (ECF No. 116), to which Kaiser replied (ECF No. 128).  For the following reasons, the Motion is granted in part, denied in part, and deferred in part.

### I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

 In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[1]

 KFHP is a Colorado nonprofit corporation that sells health insurance plans to corporations, organizations, and the general public in Colorado.  CPMG is a Colorado professional corporation and the exclusive provider of medical and other healthcare services for KFHP health plans in the state.  Defendants are part of a larger, nationwide network, and are the entities responsible for that network's operations in Colorado.  The Union is a labor organization as defined in 29 U.S.C. § 152 and the bargaining agent for a variety of classifications of workers employed by Kaiser, including but not limited to nurses, physician assistants, opticians, optometrists, pharmacists, and behavioral

---

[1] The following factual summary is largely based on the briefing on the Motion and documents submitted in support thereof.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination. Facts disputed by the parties are noted as such.

 In the Union's response, which contains its Statement of Additional Facts ("SAF") (ECF No. 116 at 11–15), it asserts dozens of facts that Kaiser admits—with the caveat that most of these facts are immaterial because they arose under the Staffing Article (ECF No. 128 at 5). Accordingly, the Court sees no need to reiterate these facts herein.

health professionals.

The parties have an extensive bargaining history.  The Union has represented the multi-professional collective bargaining unit since approximately 1980, and the parties have negotiated numerous collective bargaining agreements thereafter for both the multi-professional and mental health workers bargaining units.

Currently, the Union and Kaiser are parties to two collective bargaining agreements ("CBAs"): the Professional and Health Care Division CBA (sometimes referred to as the "Multi-Professional Agreement") and the Mental Health Workers CBA (sometimes referred to as the "Behavioral Health Agreement").

The current Multi-Professional Agreement and Behavioral Health Agreement (collectively, the "Local Agreements") are effective October 1, 2021 to April 2, 2026. Both agreements contain an identical "Patient Care" provision that provides, in part:

> The purpose of this provision is to set forth the understanding reached by the parties with respect to staffing and related issues.
>
> The parties recognize their mutual and ethical responsibility to provide sufficient staffing to meet quality standards of patient care, workload, and other issues affecting patient care, including, but not limited to, assuring adequate coverage, sick replacement, overtime, and to assure that no employee is required to work in any situation in which his or her license is threatened or places any employee or patient in danger.
>
> To that end, Kaiser shall provide sufficient staffing to address quality of standards of patient care and provider workload including safe coverage.
>
> The parties expressly agree that any disputes arising under this provision of the collective bargaining agreement shall not be subject to the grievance arbitration procedure . . . .

The Patient Care provisions were first included in the Local Agreements in or

around 2000.  The Multi-Professional Local Agreement provides that Kaiser has the right to set staffing levels and determine the number of employees necessary to perform a particular job.  The Local Agreements also contain a staffing provision that provides for a joint staffing committee comprised of three Kaiser members and three Union members to address staffing related issues.  The staffing committee is "responsible for reviewing the appealed staffing issues and reaching consensus on an appropriate staffing option" and "shall consider implementation of the staffing solutions regarding safe coverage while employees are off due to vacation, illness, or other leaves of absence, and to assure that employees are able to take rest periods, lunches, and vacations."

According to Kaiser, healthcare staffing is dynamic and fluid, and varies day by day, department by department, and classification by classification.  (ECF No. 98 at 6 ¶ 9.)  The Union avers that healthcare staffing "*can* be" dynamic and "*can* vary by day, department, and classification, but the evidence does not support this is *always* the case."  (ECF No. 116 at 4 ¶ 9 (emphasis in original).)  The Union's knowledge of purported staffing issues and the alleged breach of the Patient Care provisions are well documented in, *inter alia*, reports to the joint staffing committee, contractual grievances, other documents, and complaints made directly to the Union through its Union Stewards.

Kaiser asserts that the parties had opportunities to negotiate a solution to these staffing issues during collective bargaining for the Local Agreements prior to filing this lawsuit in 2021.  (ECF No. 98 at 6 ¶ 11.)  The Union disputes that the parties had opportunities to negotiate a solution to these staffing issues, "to the extent Kaiser

intends to imply there is one solution appliable to all staffing issues or that the parties could necessarily reach agreement on any solution through bargaining."  (ECF No. 116 at 4 ¶ 11.)

The Union's lawsuit challenges Kaiser's staffing decisions and staffing levels. According to the Union, staffing at Kaiser has been an ongoing issue and inadequate "for decades—dating back to the predecessor lawsuit" filed in 2002.  Kaiser states that "according to the Union's President, even after a previous lawsuit on the same topic was settled, concerns regarding staffing reemerged as early as 2010."  (ECF No. 98 at 7 ¶ 14.)  However, the Union denies this statement, stating that Kaiser misstates the Union President's testimony; the Union states that the President testified that there have been staffing issues for years—in her knowledge, since 2010.  (ECF No. 116 at 5 ¶ 14.)

Kaiser asserts that that "Union's awareness of Kaiser's alleged staffing inadequacies in violation of the Patient Care provisions, which is what is 'at issue here,' persisted through 2013."  (ECF No. 98 at 7 ¶ 15.)  The Union denies this statement as a legal conclusion and states that it "is and was aware of staffing issues prior to and through 2013" and that "numerous staffing issues have arisen (and been resolved) since 2013)."  (ECF No. 116 at 6 ¶ 15.)

The parties dispute whether in 2016 the Union received "numerous" complaints regarding staffing in various departments and brought grievances alleging a breach of the Patient Care provisions.  Kaiser asserts that on November 28, 2016, the Union submitted a staffing concern for Kaiser's pharmacy department alleging that staffing levels "put patient safety at risk."  Becky Sassaman, a Union steward, confirmed that staffing in Kaiser's pharmacy department has been an issue since November 2016.

(ECF No. 98 at 7 ¶¶ 16–17.)  The Union disputes that there were "numerous complaints" or that there were grievances alleging a breach of the Patient Care article in 2016.  (ECF No. 116 at 6 ¶¶ 16–17.)  Additionally, the parties dispute when the Union asserts that the "triggering events for the remedy sought here occurred."  Kaiser states that the Union asserts that the triggering events occurred "in or about October 2017") but "varies by department."  (ECF No. 98 at 7 ¶ 18.)  By contrast, the Union asserts that the "triggering events" did not all occur in or around October 2017; instead, the Union states that it seeks a remedy with respect to issues dating back to October 2017 and through the present.  (ECF No. 116 at 7 ¶ 18.)

Kaiser asserts that in the spring of 2017, the Union raised at least four separate staffing concerns from employees in various departments, which the Union disputes. (ECF No. 98 at 8 ¶ 19; ECF No. 116 at 8 ¶ 19.)  The parties also dispute whether in 2017 the Union filed grievances against Kaiser alleging violations of the Patient Care provisions.  (ECF No. 98 at 8 ¶ 20; ECF No. 116 at 8 ¶ 20.)   Kaiser states that in 2018, the Union became aware of more staffing issues.  The Union agrees that it was so aware, but disputes the specific examples Kaiser cites.  (ECF No. 116 at 9 ¶ 21.)  In August 2019, after years of complaints to the parties' staffing committee, the Union filed no less than four grievances specifically asserting violations of the Patient Care provision (Article 27 in the Multi-Professional CBA).

The Union's First Amended Complaint states: "Even prior to the COVID-19 pandemic, Kaiser's Colorado regional operation suffered from chronic staffing shortages and inadequate provider coverage."  In its certified answers to Kaiser's interrogatories, the Union states:

> Plaintiff's Amended Complaint alleges that chronic staffing shortages and inadequate provider coverage have been an ongoing issue with respect to Defendants' operation for decades—dating back to the predecessor lawsuit filed [in 2002] by Plaintiff against Defendants.  However, with respect to the within litigation, Plaintiff only seeks a remedy with respect to the chronic staffing shortages and inadequate coverage commencing in or about October 2017 to the present.

Despite its protests about staffing issues dating back as far as 2010 and since at least October 2017, the Union did not file this lawsuit asserting breaches of the Patient Care provisions due to inadequate staffing until October 14, 2021, seeking declaratory and injunctive relief.

Kaiser asserts that the Union's delay in filing this lawsuit has disadvantaged Defendants because witness memories have faded and a key witness has passed away, which the Union disputes.  (ECF No. 98 at 9 ¶ 26; ECF No. 116 at 10 ¶ 26.) According to Kaiser, "even with the delay, the Union does not know what it seeks from this lawsuit."  (ECF No. 98 at 9 ¶ 27.)  In response, the Union points the Court toward its prayer for relief, among other specific remedies.  (ECF No. 116 at 10 ¶ 27.)

### III. PROCEDURAL HISTORY

The Union filed its Complaint on October 14, 2021.  (ECF No. 1.)  The First Amended Complaint was filed January 13, 2022, alleging one claim for breach of contract under 29 U.S.C. § 185.  (ECF No. 32.)  The Union alleges that Kaiser has failed to adhere to its obligations under the Patient Care Article to "provide sufficient staffing to address quality of standards of patient care and provider workload including safe coverage."  (*Id.* ¶ 51.)  The Union requests declaratory and injunctive relief, specifically: that the Court declare Kaiser to be in breach of the Patient Care Article of

the relevant local CBAs and enter a permanent injunction requiring Kaiser to increase staffing at its facilities and maintain adequate staffing in compliance with the parties' agreements.  (*Id.* at 18.)

Kaiser filed its Answer and Counterclaim on October 21, 2022, alleging one claim for breach of contract.  (ECF No. 52.)  Kaiser alleges that the Union "was obligated to assist Kaiser in resolving staffing related issues" under the Patient Care Article.  (*Id.* ¶¶ 23–24.)  Kaiser alleges the Union has failed to adhere to its obligations under the CBAs. (*Id.* ¶ 26.)  Kaiser requests that the Court declare the Union "to be in breach of the [CBAs]" and compel the Union to "specifically perform its obligations under the collective bargaining agreements: (i) to provide sufficient staffing to meet the quality standards of patient care, workload, and other issues affecting patient care, including, but not limited to, assuring adequate coverage; (ii) to submit such issues to the appropriate dispute mechanism; and (iii) such other and further obligations under the applicable collective bargaining agreements which the Union has breached as proven at trial."  (*Id.* at 18.)

## IV. ANALYSIS

### A.    Whether the Union's Claim Is Time-Barred

#### 1.    Statute of Limitations

All Section 301 lawsuits are governed by federal law.  *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) ("We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws."); *Teamsters v. Lucas Flour Co*., 369 U.S. 95, 103 (1962) ("The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute."). Although "federal law controls when the federal cause of action accrues," *Dameron v.*

*Sinai Hosp. of Baltimore, Inc.*, 595 F. Supp. 1404, 1412 (D. Md. 1984), the Labor

Management Relations Act ("LMRA") does not provide a statute of limitations for claims

like the ones asserted here.

Accordingly, the Court must "'borrow' the most suitable statute or other rule of

timeliness from some other source." *Poletto v. Battaglino*, 2023 WL 6449239, at *7 (D.

Colo. Aug. 14, 2023), *aff'd*, 2024 WL 1757316 (10th Cir. Apr. 24, 2024) (quoting

*DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983)).  "Usually, when

federal statutes are silent on limitations periods, the court borrows a statute of

limitations from state law." *Id.* (quoting *McKee v. Transco Prods., Inc.*, 874 F.2d 83, 86

(2d Cir. 1989)).  However, the Court does not "mechanically apply a state statute of

limitations simply because a limitations periods is absent from the federal statute." *Id.*

(quoting *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 367 (1977) (alteration

omitted)).  This is because "[s]tate legislatures do not devise their limitations periods

with national interests in mind, and it is the duty of the federal courts to assure that the

importation of state law will not frustrate or interfere with the implementation of national

policies." *Id.*  "[W]hen a rule from elsewhere in federal law clearly provides a closer

analogy than available state statutes, and when the federal policies at stake and the

practicalities of litigation make that rule a significantly more appropriate vehicle for

interstitial lawmaking, [the Supreme Court has] not hesitated to turn away from state

law." *DelCostello*, 462 U.S. at 172.

Kaiser urges the Court to apply a six-month statute of limitations, relying on

*DelCostello* for support.  (ECF No. 98 at 11–12.)  In *DelCostello*, the Supreme Court

held that "hybrid" LMRA claims—wherein an employee simultaneously sues an

employer for a breach of a collective bargaining agreement and a labor union for a breach of the duty of fair representation—are subject to the six-month statute of limitations set out in the NLRA.  The Supreme Court concluded that the National Labor Relations Act's ("NLRA") statute of limitations would be more appropriate to apply to a hybrid LMRA claim than a state statute of limitations because the NLRA's statute of limitations was "actually designed to accommodate a balance of interests very similar to" those at stake under the LMRA.  *DelCostello*, 462 U.S. at 169, 172.

Here, however, the Union's claim is not a hybrid claim involving allegations that a breach of the duty of fair representation occurred; rather, the Union alleges a straightforward breach of the CBAs by Kaiser.  The Union emphasizes that "because *DelCostello* deviated from state law because of the concurrent duty of fair representation charge, courts have predominantly confined its application to that context.  (ECF No. 116 at 18 (citing *Edwards v. UPGWA*, 46 F.3d 1047, 1050 (10th Cir. 1995) (describing *DelCostello* as applying a six-month statute of limitation to "hybrid § 301/unfair representation suits").)  Instead, the Union argues that this case is more similar to *Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 704–05 (1966), in which the Supreme Court stated that ""since no federal provision governs, we hold that the timeliness of a § 301 suit, such as the present one, is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations."  That case, however, is also somewhat distinguishable from this one in that it involved "essentially an action for damages caused by an alleged breach[.]"  *Id.* at 704–05 n.7.  Here, there is no request for damages.

The Court concludes that because this case is distinguishable from *DelCostello*

in that no hybrid claims are alleged, the appropriate state statute of limitations should apply.[2]  However, the parties disagree as to *which* state statute of limitations should apply.  There are two candidates.  First, Colorado Revised Statutes § 13-80-102(g) provides that "[a]ll actions upon liability created by a federal statute where no period of limitation is provided in said federal statute" "must be commenced within two years after the cause of action accrues."  Second, Colorado Revised Statutes § 13-80-101(1)(a) provides that "[a]ll contract actions" "shall be commenced within three years after the cause of action accrues."

Kaiser contends that the "more specific Colorado two-year statute of limitations governs, rather than the state's catchall three-year limitation, because C.R.S. § 13-80-102(1)(g) applies by definition where a federal statute is silent—regardless of the theory of the claim."  (ECF No. 128 at 6 n.8.)  By contrast, the Union contends that "the most analogous statutory period is Colorado's three-year period for breach of contract claims under C.R.S. § 13-80-101(1)(a)."  (ECF No. 116 at 20.)  Notably, and not surprisingly, each party advocates for a statute of limitations most favorable to its case, but both parties argue that ultimately, it does not matter which statute of limitations applies. (ECF No. 116 at 16; ECF No. 128 at 6.)

Having thoroughly considered the parties' arguments, the Court finds that Colorado's three-year statute of limitations for contract actions applies to the Union's claim here.  Although Kaiser cites one case in which the Tenth Circuit applied the two-year statute of limitations provision in the absence of a statute of limitations in a federal

---

[2] In concluding as much, the Court acknowledges that the Union has not alleged a claim for damages in this case, but nevertheless, the Court finds this case is more similar to *Hoosier* than *DelCostello*, the latter of which featured a very particular type of hybrid claim that drove the Supreme Court's reasoning.

law, that case involved the Airline Deregulation Act, which is not at issue here.  *See Bowdry v. United Air Lines*, 956 F.2d 999, 1006 (10th Cir. 1992) (applying the two-year statute of limitations for claim brought under the federal Airline Deregulation Act, which does not contain a statute of limitations).  Instead, the Court finds the application of the three-year statute of limitations in *International Brotherhood of Electrical Workers, Local #111 v. Public Service Company of Colorado*, 176 F. Supp. 3d 1102, 1112 (D. Colo. 2016) persuasive because that case involved claims brought under § 301—just like this case.  Accordingly, the Court applies the three-year statute of limitations applicable in breach of contract cases to the Union's claim here.

> 2.    Accrual of the Union's Claim

The question of when a plaintiff's claims accrued is a matter of federal common law.  *Id*.  Accordingly, the limitations period begins to run on the Union's claim for breach of the CBAs when it "[knew] or in the exercise of reasonable diligence should have known or discovered the acts" constituting the alleged CBA violations.  *Id.* (citing *Lucas v. Mountain States Telephone & Telegraph*, 909 F.2d 419, 420–21 (10th Cir.1990)).

Kaiser argues that even if the Court applies the most expansive statute of limitations available—which it just has—this lawsuit, filed in October 2021 under § 301 for alleged violations of the Patient Care Articles in the CBAs, is "too late."  (ECF No. 98 at 14.)  According to Kaiser, "the Union was aware of an alleged breach of the Patient Care provisions, as demonstrated by the staffing concerns recited on the face of its Complaint and Amended Complaint, all before the cutoff of October 2018—three years before the initial filing."  (*Id.* at 14–15.)  Kaiser enumerates examples in support, including, but not limited to the following:

- "Even prior to the COVID-19 pandemic, Kaiser's Colorado regional operation suffered from chronic staffing shortages and inadequate provider coverage." (First Am. Compl. (ECF No. 32), ¶ 1.)

- In one Kaiser Oncology Infusion Center, staffing issues "began in or around 2017." (First Am. Compl. (ECF No. 32), ¶ 40.)

- "Plaintiff's Amended Complaint alleges that chronic staffing shortages and inadequate provider coverage have been an ongoing issue with respect to Defendants' operation for decades—dating back to the predecessor lawsuit filed [in 2002] by Plaintiff against Defendants. However, with respect to the within litigation, Plaintiff only seeks a remedy with respect to the chronic staffing shortages and inadequate coverage commencing in or about October 2017 to the present." (Ex. A, Answer to Interrog. No. 1, p. 3.)

- "We had staffing concerns filed since my time on the staffing committee, which commenced around 2010." (Ex. B, at 13:8–9.)

- ". . . at least since 2010, I know we've had staffing issues." (Ex. M, at 11:22–23.)

- "To my recollection, there were staffing issues prior to 2017." (Ex. B, at 21:18–19.)

(ECF No. 98 at 15.)  Based on such allegations and evidence in the record, Kaiser argues that "the Union cannot reasonably argue that its staffing claim brought under Section 301 did not accrue on or before October 2017—at the very latest."  (*Id.* at 16.)

In response, the Union claims that the lawsuit was timely filed under any potentially applicable statute of limitations.  (ECF No. 116 at 21.)  Specifically, it argues that "Kaiser erroneously describes inadequate staffing as a singular wrong that by some stretch of the imagination could have and should have been summarily addressed years ago (before many staffing issues even arose)—ignoring the fact that staffing issues are often discrete and factually nuanced and must be considered individually."  (*Id.*)  Additionally, the Union contends that Kaiser's "conclusory description of its staffing issues obscures the factual disputes as to when certain staffing inadequacies arose,

further preventing summary judgment here."  (*Id.*)  For support, the Union argues that certain staffing issues were first identified or raised long ago, but nonetheless, the continuing contract or continuing violations doctrines save the claims from staleness. (*Id.* at 21–25.)  However, Kaiser vehemently disputes that the continuing contract or continuing violations theories can apply to make such claims viable.  (ECF No. 128 at 8–10.)

Having considered the parties arguments, like Kaiser, the Court is not convinced that the continuing contract or continuing violations doctrines apply in this context.  The Union has not cited relevant case law in the labor dispute context that persuades the Court that it may bring claims against Kaiser based on events that occurred more than three years before the Union filed this lawsuit.  Accordingly, the Court rejects such theories.

Nevertheless, the Court agrees with the Union that "there are factual disputes as to when certain staffing inadequacies arose, evolved, and/or ended, and when Local 7 learned of certain staffing issues—and even which staffing issues amount to staffing inadequacies in violation of the Patient Care Article."  (ECF No. 116 at 25 (citing evidence).)  To that point, the Court anticipates that the Union has a steep hill to climb at trial to differentiate actionable events under the Patient Care Article from those that must be arbitrated under the Staffing Article.  Regardless, the Union has identified genuine issues of material fact that preclude summary judgment.

Accordingly, the Motion is granted in part and denied in part.  It is granted to the extent that the Court finds that the three-year statute of limitations applies, and events occurring before that limitations period cannot give rise to liability on Kaiser's part.  The

Motion is denied to the extent Kaiser argues that a different limitations period applies and that the Union's claim is completely time-barred.

**B.    Laches**

Kaiser argues that the Union's claim is barred by the doctrine of laches.  (ECF No. 98 at 16.)  "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961).  Kaiser argues that the Union had full knowledge of the staffing issues arising under the Patient Care Article as early as 2010; the Union's delay in seeking injunctive relief is unreasonable because if patient and employee safety were truly at risk, the Union was obligated not to sit on these issues for years before filing this lawsuit; and Kaiser has suffered prejudice by the Union's delay because memories have faded and a key witness for Kaiser recently died.  (*Id.* at 17–18.)

While some portions of Kaiser's arguments may have some merit, the Court cannot find as a matter of law that the Union's claim is barred by laches.  As explained above, there is a genuine dispute of material fact as to whether at least some of the discrete events in question occurred within the three-year limitations period, undermining any lack of diligence argument.  Additionally, as the Union explains, both sides were aware of staffing issues for years, and the Union repeatedly raised staffing issues with Kaiser.  (ECF No. 116 at 28.)  Accordingly, the portion of the Motion requesting summary judgment based on the doctrine of laches is denied.

**C.    Requested Relief**

1.    <u>Whether the Requested Relief Is Impossible</u>

In the First Amended Complaint, the Union requests "a Court order, *inter alia*,

declaring Kaiser in breach of the (already existing) Patient Care Article and requiring Kaiser to increase staffing and maintain adequate staffing "in compliance with the parties' [already existing] agreements."  (ECF No. 116 at 28 (citing ECF No. 32 at 18).)

Kaiser argues that it would "be impossible to craft an order to remedy the alleged harm" and such an order would essentially require the Court to "rewrite the Local Agreements, or to design benchmarks or quotas for 'adequate staffing' in a fluid and dynamic healthcare system."  (ECF No. 98 at 19.)  The Union responds that it "has not asked the Court to impose any contractual provisions (and ensuing obligations) that Kaiser does not already have."  (ECF No. 116 at 29.)  Further, it argues that to the extent it seeks "benchmarks or quotas" as part of its requested relief, this is not "impossible."  (*Id.*)  Finally, the Union points out that courts are "routinely called upon to resolve complex and significant disputes" and that the parties agreed to submit disputes arising under the Patient Care Article to the court for a resolution.  (*Id.* at 30.)

The Court acknowledges that any future order and judgment stemming from a finding in the Union's favor may be complex, but that is not reason to grant summary judgment in favor of Kaiser—particularly at this stage of the litigation, before the bench trial has even occurred and subsequent findings of fact and conclusions of law have been entered.  As such, the Court considers Kaiser's request for summary judgment on this issue to be premature, and defers ruling on this portion of the Motion until after the trial and all related proceedings have concluded.

     2.   Norris-LaGuardia Act

The Norris-LaGuardia Act ("NLA"), passed in 1932 largely to protect employees' ability to organize and bargain collectively, *see Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 708 (1982), contains a broad prohibition against

injunctions in labor disputes:

> No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101 ("§ 1").  Other provisions of the NLA outline "specific acts not subject to restraining orders or injunctions," including strikes, unionizing, picketing, and refusing to remain in an employment relationship, *id*. § 104 ("§ 4"),[3] and establish that certain

---

[3] Section 4 of the NLA provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

procedural requirements must be met before an injunction may issue in a labor dispute,[4] *see id.* § 107 ("§ 7").

Section 301, passed in 1947 as part of the LMRA, provides without limitation that "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a).  "Various courts have concluded that § 301 authorizes federal courts to issue injunctions to enforce CBAs."  *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt & Whitney*, 230 F.3d 569, 579 (2d Cir. 2000) (finding district court had jurisdiction to issue injunction as remedy for employer's failure to comply with collective bargaining agreement (CBA) provision requiring it to make "every effort" to preserve bargaining unit work, inasmuch as transfer of work was not listed in NLA as not being subject to injunctions, union's grievance was not arbitrable, and injunction promoted LMRA's purpose of enforcing CBAs and NLA's purpose of protecting workers' rights of self-organization) (citing *Drywall Tapers & Pointers v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 537 F.2d 669, 673–74 (2d Cir. 1976); *Int'l Union v. Mack Trucks, Inc.*, 820 F.2d 91, 97 (3d Cir. 1987); *Local 2750, Lumber & Sawmill Workers Union v. Cole*, 663 F.2d 983, 984 (9th Cir. 1981)).  Further, "the legislative history suggests that Congress intended that all conventional judicial remedies would be available in § 301

---

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

[4] The Court notes the procedural requirements that must be met before it may issue an injunction in a labor dispute such as this one and reminds the parties to keep these requirements in mind as this litigation progresses.

suits." *Id.* (citing *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 207 (1962), *overruled on other grounds by Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970) (under the *Boys Markets* exception, employers may obtain injunctions against strikes pending arbitration of labor disputes where the CBA contains a no-strike clause and the strike concerns a dispute subject to mandatory arbitration)).

Here, Kaiser argues that the NLA divests this Court of jurisdiction to issue the injunction the Union seeks in this matter and requests that the Court dismiss the Union's request for injunctive relief. (ECF No. 98 at 20–21.) Kaiser cites § 1 of the NLA and very generally states that this case "is a 'controversy concerning terms or conditions of employment,' qualifying as a labor dispute under Section 4 of the Norris-LaGuardia Act." (*Id.* at 21.) While this is certainly a labor dispute, Kaiser does not specify what provision of § 4 covers this lawsuit, nor does it analyze any of the vast body of case law associated with the NLA. To the extent Kaiser asserts that § 4 prohibits an injunction in this case,[5] the Court disagrees that any of the prohibited injunctions enumerated in § 4 apply here.

The Union's response is equally broad and unhelpful in deciding this issue. (ECF No. 116 at 30–32.) Although the Union tries to wedge its facts into the ambit of *Boys Markets*—where the Supreme Court permitted an injunction in a labor dispute—it unsuccessfully tries to fit the proverbial square peg into a round hole. In the Court's view—and neither party's arguments squarely address the issue in a useful way—*Boys Markets*, with its core questions concerning strikes and arbitration, simply does not

---

[5] Due to the cursory and undeveloped nature of Kaiser's § 4 argument, the Court deems it waived. *See United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013) (cursory argument not meaningfully developed by any analysis or citation is deemed waived).

apply here.  The Union also cites broad propositions from other NLA cases, but they also do not answer the question of the NLA's applicability to *this* case.

In Kaiser's reply, it gamely attempts to bolster its NLA argument by contending that the remedy sought in this case would exceed the NLA § 9's "mandate that injunctions '"include only a prohibition of such *specific acts* . . . *expressly complained of in the . . . complaint*." (ECF No. 128 at 14 (emphasis in reply brief).)  For support, Kaiser argues that the First Amended Complaint does not specifically articulate the remedies for staffing issues; those remedies are only found in other parts of the record, such as the Union's response brief and cited exhibits.  (*Id.*)  Kaiser does not otherwise address the Union's arguments raised in its response.

Nevertheless, in its independent research the Court located *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt & Whitney*, 230 F.3d 569, 579 (2d Cir. 2000), which appears to address the factual scenario present here.   The Court could not locate a Tenth Circuit case addressing the relevant issues but finds *Aeronautical* highly persuasive and adopts its reasoning.

In *Aeronautical*, the Second Circuit explains that despite the apparent conflict between § 301 and the NLA, "the two statutes have been accommodated by judicial decisions holding that § 301 empowers the federal courts to enforce CBAs by injunction only in cases not specifically covered by the NLA, provided judicial relief is otherwise appropriate." *Aeronautical*, 230 F.3d at 580.  "The decisions of . . . the Supreme Court . . . suggest that injunctive relief is permitted under circumstances that do not implicate the abuses the NLA was enacted to prevent." *Id.*  For instance, in *Textile Workers*

*Union v. Lincoln Mills*, 353 U.S. 448 (1957), the Supreme Court held that an injunction could issue to compel arbitration of grievance disputes despite the prohibitions of the NLA, largely because "failure to arbitrate was not a part and parcel of the abuses against which the [NLA] was aimed" and was not listed in § 4 as one of the "kinds of acts which had given rise to abuse of the power to enjoin."  *Id*. at 457–58.  "Under this reasoning, despite the NLA's broad prohibition as a textual matter, a court may nonetheless issue an injunction in a labor dispute against conduct not specifically enumerated in § 4 or otherwise related to the abuses that motivated the NLA in the first place."  *Aeronautical*, 230 F.3d at 580.

While it is "normally inappropriate for federal courts to issue preliminary injunctions pending the arbitration of arbitrable disputes," *id.*, the Patient Care Article at issue here carves out an exception to arbitration and allows the parties to litigate alleged breaches in federal court.  Therefore, the Court adopts the Second Circuit's reasoning that "where a case does not concern either conduct enumerated in § 4 or a dispute subject to mandatory arbitration, the proper approach is to allow injunctive relief provided the policies of both § 301 and the NLA are thereby advanced."  *Id.*  Accordingly, the Court finds that, in the event the Union is successful in meeting the significant burden the law will impose upon it at trial, it has the authority to issue an appropriately circumscribed injunction in this case, and as a consequence this portion of the Motion will be denied.

**V. CONCLUSION**

For the reasons set forth above, the Court ORDERS:

1.      Kaiser's Motion for Summary Judgment (ECF No. 98) is GRANTED IN

PART, DENIED IN PART, AND DEFERRED IN PART, as set forth above; and

2.      This case REMAINS SET for a 9-day bench trial beginning on **January 13, 2025 at 8:30 a.m.** in Courtroom A801, and the Final Trial Preparation Conference REMAINS SET for **January 3, 2025 at 10:00 a.m.** (ECF No. 136).

Dated this 9th day of July, 2024.

BY THE COURT:

William J. Martinez
Senior United States District Judge