**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-2767-WJM-KAS

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
LOCAL NO. 7, AFL-CIO,

      Plaintiff-Counterclaim Defendant,

v.

KAISER FOUNDATION
HEALTH PLAN OF COLORADO, and
COLORADO PERMANENTE
MEDICAL GROUP, P.C.,

      Defendants-Counterclaim Plaintiffs.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
ENTERED UPON TRIAL ON THE MERITS TO THE COURT**

---

Plaintiff-Counterclaim Defendant United Food and Commercial Workers International Union, Local No. 7, AFL-CIO (the "Union" or "Local 7") brings this breach of contract action against Defendants-Counterclaim Plaintiffs Kaiser Foundation Health Plan of Colorado (the "Health Plan") and Colorado Permanente Medical Group, P.C. ("CPMG") (together, "Defendants" or "Kaiser").  The Union alleges that Defendants breached their obligation to "provide sufficient staffing to address quality standards of patient care and provider workload including safe coverage" under the parties' collective bargaining agreements ("Local CBAs").  (ECF No. 32.)  Defendants counterclaim for breach of the Local CBAs and allege that the Union failed to adhere to its obligation to assist Kaiser in resolving staffing-related issues.  (ECF No. 52.)

On January 13, 2025, the case proceeded to a six-day bench trial before the undersigned.  (*See* ECF Nos. 193–198 [hereinafter "Tr."])  After the trial, the parties submitted final proposed findings of fact and conclusions of law.  (Kaiser's Final Proposed Findings of Fact & Conclusions of Law, ECF No. 203 [hereinafter "KPF&C"]; Union's Final Proposed Findings of Fact & Conclusions of Law, ECF No. 204 [hereinafter "UPF&C"].)

Having considered the arguments and evidence submitted, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a) and 65(d).

# TABLE OF CONTENTS

I. Findings of Fact ........................................................................................ 5

  A. Parties ............................................................................................... 5

  B. Collective Bargaining Agreements ...................................................... 6

    i. *Kaiser's Authority Over Staffing* ................................................... 7

    ii. *Resolution/Grievance Procedure Article* ...................................... 9

    iii. *Patient Care Article* ................................................................... 12

    iv. *Staffing Article* .......................................................................... 16

    v. *Workload Distribution Provisions* ................................................ 21

    vi. *LOU 8* ........................................................................................ 23

  C. Transformation ................................................................................. 25

  D. Primary Care Staffing ...................................................................... 27

    i. *Reduction in Part-Time Positions* ............................................... 28

    ii. *Provider Template & Patient Panel Expansions* .......................... 28

    iii. *Float Pool* .................................................................................. 33

    iv. *Negative Patient Outcomes and Licensure Risk* ......................... 35

    v. *Prior Staffing Concerns and/or Grievances* ................................ 36

  E. Message Management Staffing ......................................................... 39

    i. *Insufficient Staffing* .................................................................... 42

    ii. *Red Flagging Messages* .............................................................. 47

    iii. *2022 Reorganization* ................................................................. 50

    iv. *Negative Patient Outcomes and Licensure Risk* ......................... 51

    v. *Prior Staffing Concerns and/or Grievances* ................................ 52

  F. Urgent Care Staffing ........................................................................ 55

    i. *Reduction in Part-Time Positions* ............................................... 57

ii. *Workload and Scope of Practice* ........................................................ 59

iii. *Negative Patient Outcomes and Licensure Risk* ............................... 60

iv. *Prior Staffing Concerns and/or Grievances* ..................................... 61

G. Pharmacy Services Staffing ................................................................. 64

i. *Increased Workloads* ...................................................................... 66

ii. *Negative Patient Outcomes and Licensure Risk* ............................... 72

iii. *Prior Staffing Concerns and/or Grievances* ..................................... 73

H. Behavioral Health Services Staffing ...................................................... 75

i. *Inability to Meet Rising Demand* ..................................................... 77

ii. *Negative Patient Outcomes and Licensure Risk* ............................... 82

iii. *Prior Staffing Concerns and/or Grievances* ..................................... 83

I. Kaiser's Counterclaim ........................................................................ 86

i. *"Calling Out Well"* ........................................................................... 86

ii. *SBON Complaints* .......................................................................... 87

J. The Parties' Requested Relief ............................................................. 88

**II. Conclusions of Law** ............................................................................ **90**

A. Legal Standards ................................................................................ 90

B. The Staffing Article Covers This Dispute ............................................. 94

C. The Union Failed to Rebut the Presumption of Arbitrability. ................ 96

**III. Rule 52(c) Motions** ............................................................................ **99**

**IV. Conclusion** ...................................................................................... **100**

## I. FINDINGS OF FACT

**A.     Parties**

1.      Kaiser Permanente is the trade name of a health maintenance organization providing prepaid comprehensive medical, surgical, and hospital services to voluntarily enrolled members.  (KPF&C ¶ 6.)[1]

2.      Defendants are part of Kaiser Permanente's larger, nationwide network and, specifically, are the entities responsible for the network's operations in Colorado.  (KPF&C ¶ 4.)

3.      The Health Plan is a Colorado nonprofit corporation that sells health insurance plans to corporations, organizations, and the general public in Colorado, and provides a vast array of medical services to members under the terms of those plans.  It is Colorado's largest nonprofit healthcare provider.  (KPF&C ¶¶ 2, 5.)

4.      The Health Plan in turn contracts with CPMG for the provision of physician and medical services for Kaiser members.  (KPF&C ¶ 6.)

5.      CPMG is a for-profit Colorado professional corporation and the exclusive provider of medical and other healthcare services for the Health Plan in the state.  It employs numerous physicians, including family practice and primary care providers and advanced specialists in many areas of practice.  (KPF&C ¶¶ 3, 7; Tr. 871:8–12.)

6.      Kaiser operates a number of medical offices and facilities throughout the Denver metro area where care is provided to members, from standard medical offices to

---

[1] The Court cites the parties' final proposed findings of fact only where the parties have stipulated to a fact (in whole or, where applicable, in part).

urgent care to surgery centers.  Kaiser also contracts with hospitals for some aspects of patient care.  (KPF&C ¶ 11.)

7.      Local 7 is a labor organization under Section 2(5) of the National Labor Relations Act ("NLRA") and the recognized bargaining agent for the majority of the Health Plan's clinical, non-physician professionals.  (KPF&C ¶¶ 1, 10.)

8.      These workers comprise two different bargaining units: (1) the multi-professional bargaining unit, which includes but is not limited to registered nurses ("RNs"), physician assistants ("PAs"), advanced practice nurses, opticians, optometrists, pharmacists, and pharmacists-in-charge ("PICs"); and (2) the mental health professional bargaining unit, which includes behavioral health professionals.  (*E.g.,* Tr. 556:6–21.)

**B.      Collective Bargaining Agreements[2]**

9.      The Union and Kaiser have an extensive bargaining history.  The Union has represented the multi-professional collective bargaining unit since approximately 1980, and the parties have negotiated numerous collective bargaining agreements ("CBAs") thereafter for both the multi-professional and mental health professional bargaining units.  (KPF&C ¶ 54.)

10.      Specifically, the Union and Kaiser are parties to the following local CBAs implicated in this case, which have largely analogous provisions:

      a.      Multi-Professional CBA (2018–2022), Ex. 3;

      b.      Multi-Professional CBA (2022–2026), Ex. 4 (together, "Multi-Professional CBAs");

---

[2] Kaiser and the Union are also privy to a National Labor Management Partnership Agreement ("National Agreement").  (Ex. 10.)  Having previously granted summary judgment in favor of the Union as to any claim that it breached the National Agreement, the Court does not address that Agreement herein.  (*See* ECF No. 141 at 16–17.)

   c.  Mental Health Professional CBA (2018–2022), Ex. 1; and

   d.  Mental Health Professional CBA (2022–2026), Ex. 2 (together,

"Mental Health CBAs") (collectively, the "Local CBAs") (KPF&C ¶ 55; UPF&C ¶ 1.)

  11.  The Union and Kaiser negotiated the successor agreements (*i.e.,* the

2022–2026 CBAs) as recently as the Fall of 2021.  In relevant respects, their provisions

remain unchanged from the previous contracts.  (KPF&C ¶ 56; UPF&C ¶ 2; *compare*

Ex. 3 *with* Ex. 4 *and* Ex. 1 *with* Ex. 2.)

  *i.*  ***Kaiser's Authority Over Staffing***

  12.  As relevant to this dispute, the Local CBAs provide that, with certain

contractual limitations, Kaiser alone determines staffing levels for a given department in

its facilities, including the right to reduce and reorganize personnel.  (*E.g.,* Ex. 2, at Art.

3, § 1 ("The Union recognizes that the Employer has the duty and the right to manage

the facilities and to direct the working forces.  This includes the right to hire, transfer,

promote, demote, layoff, discipline and discharge employees subject to the terms of this

Agreement."); *but see* Exs. 3 and 4, at Art. 9; Exs. 1 and 2, at Art. 9 (outlining

parameters Kaiser must adhere to when reducing and/or displacing staff).)

  13.  In practice, Kaiser allocates staffing based on "full-time equivalent" or

"FTE," which is not always synonymous with employee head count because some

employees work less than 1.0 FTE (*i.e.*, forty hours per week).  (KPF&C ¶ 32; UPF&C

¶ 7(a); Tr. 654:11–13.)

  14.  Kaiser also determines changes to a department's FTE, and whether the

FTE will be divided among employees working 1.0, 0.9, or other part-time schedules.

(KPF&C ¶ 68; UPF&C ¶ 7(b).)

15.    Kaiser uses staffing models to determine the number and mix of staff (*e.g.*, Licensed Practical Nurses ("LPNs"), RNs, PAs, etc.) in a particular department or clinic at any given time.  (KPF&C ¶ 33.)

16.    The staffing models are based on several factors including but not limited to historical patient demand, number of patient members, physician productivity (*i.e.*, patients seen per day), "no show" or cancellation rates, historical provider absences, and benchmarks that show how CPMG compares internally within the Kaiser enterprise and externally with competitors.  (KPF&C ¶¶ 34–35, 39, 42, 46, 49, 53.)

17.    The staffing models are dynamic to take into account the fluidity of these factors.  For instance, patient demand increases during cold and flu season, as do provider absences.  Provider absences are also greater during holidays and summers when families are taking vacations.  (KPF&C ¶¶ 38, 41, 47–48.)

18.    In general, the higher the demand and/or the more patient members, the greater number of FTE is needed to provide patient care.  The corollary is also true— the lower the demand and/or the lower number of patient members, a smaller number of FTE is needed to provide quality patient care.  (KPF&C ¶¶ 43, 44.)

19.    Moreover, provider productivity is a particular challenge for Kaiser because the health plans are not fee-for-service; Kaiser does not bring patients back again to charge another copay.  (KPF&C ¶ 51.)

20.    The Union has no ultimate authority over hiring or staffing decisions, but it may raise concerns or relay concerns from members about staffing to Kaiser.  (*See* Exs. 1 and 4, at Art. 3; UPF&C ¶ 8; Tr. 713:8–11.)

21.    Three sequential articles of the Local CBAs—as well as one additional article of the Multi-Professional CBAs and two Letters of Understanding ("LOUs") appended to the Mental Health CBAs—inform the parties' obligations with respect to staffing and potential dispute resolution processes in the event of a disagreement regarding same.

### ii.    *Resolution/Grievance Procedure Article*

22.    *First*, most disputes between the Union and Kaiser are subject to arbitration per Article 25 of the Multi-Professional CBAs and its identical counterpart Article 23 of the Mental Health CBAs (collectively, the "Resolution/Grievance Procedure Article").  (Exs. 3 and 4, at Art. 25; Exs. 1 and 2, at Art. 23; KPF&C ¶ 58.)

23.    Section 1 of the Resolution/Grievance Procedure Article provides: "Any and all matters of controversy, dispute, or disagreement of any kind or character existing between the parties and arising out of or in any way involving the interpretation or application of the terms of [the Local CBAs] shall be examined and resolved by this Resolution/Grievance Procedure."  (Exs. 3 and 4, at Art. 25; Exs. 1 and 2, at Art. 23.)

24.    Section 2 sets forth the "Resolution Procedure," pursuant to which Kaiser and the Union agree to first "attempt resolution through informal discussion so that the submission of a written grievance may not be necessary."  (*Id.*)

25.    "If agreement is not reached through the Resolution Procedure," Section 3 sets forth the "Grievance Procedure."  It prescribes that "a written grievance shall be forwarded to the [relevant] supervisor, appropriate level of management, and Human Resources, within [14] calendar days," after which the "Human Resources Teamleader or designee shall schedule a meeting within [14] calendar days with all parties involved to discuss the grievance and proposed remedy."  (*Id.*)

26.     Following the meeting, the Human Resources Teamleader or designee is to "provide the Union with the final Employer decision, in writing," within another 14 calendar days thereafter.  (*Id.*)

27.     "If an agreement [still] cannot be reached through the grievance procedure," "the Union may invoke arbitration by submitting a written notice to the Human Resources Teamleader or designee, within [14] calendar days after the date of the Employer decision" pursuant to the Arbitration Procedure set forth in Section 4.  (*Id.*)

28.     In such case, "[e]very reasonable attempt shall be made to hear the case within six months from the date of the grievance."  The arbitrator is "authorized to rule upon and issue a decision in writing on any grievance for arbitration, including the question of whether or not the grievance is arbitrable."  (*Id.*)

29.     The Resolution/Grievance Procedure also contains certain "General" provisions including, nonexhaustively, that:

> A.     The time limits set forth in this Article may be extended upon mutual agreement of the parties. Formal grievances and/or arbitration may, by mutual agreement, be referred back or advanced to any step of the Resolution/Grievance/Arbitration Procedure.
>
> B.     When two [] or more employees are part of a common grievance, the matter shall be heard as a single grievance.
>
> C.     If either party does not respond within the specified time limit(s), the other party may proceed to the next step.  Any matter not appealed within the specified or mutually agreed extended time limit(s) shall be considered resolved.
>
> D.     It is understood that the representative of the parties at each step in the foregoing Resolution/Grievance/Arbitration Procedure[] shall have the authority to resolve the issue(s).

(*Id.*)

30.    Stephanie Price has been an Employee and Labor Relations Consultant at Kaiser since 2016.  As a contract specialist, Price helps managers navigate through the Local CBAs' policies and procedures and performs human resources-related functions. She is very familiar with the Local CBAs and uses them day-to-day.  (KPF&C ¶ 72.)

31.    Price's responsibilities also include processing all of the grievances for the Colorado region, including those filed by the Union.  (Tr. 785:1–13.)

32.    Price testified that, between 2018 and 2023, Local 7 filed 637 grievances against Kaiser.  The grievances related to a variety of topics, including staffing, terminations, disciplinary proceedings, licensure, and/or patient care.  (Tr. 811:15–25.)

33.    The documentary evidence in the record supports that many of these grievances were filed by Leah Dowodzenka, who has been a Union Business Representative since 2017.  (Tr. 484:22–485:10; UPF&C ¶ 230.)

34.    Dowodzenka testified that she files grievances when she believes that Kaiser has breached the Local CBAs to try to get management to comply.  She estimated that, since 2017, she has filed an average of one grievance per week.  (Tr. 486:11–15, 489:7–16.)

35.    Dowodzenka testified that grievances can pertain to a particular Union member, or they can be on behalf of the entire bargaining unit or a specific or regional department.  (Tr. 490:11–24.)

36.    When choosing Articles of the Local CBAs allegedly violated by Kaiser, Dowodzenka references language in the Local CBAs that "might be applicable."  (Tr. 492:22–25 (emphasis added).)

37.    A fair number of the grievances Dowodzenka has filed have been

"recommended" for arbitration, but only three have been arbitrated.  (Tr. 489:17–490:6.)

38.    Dowodzenka's testimony suggested that the Union rarely demanded

arbitration on the grievances she filed related to insufficient staffing.  However, she

acknowledged that the Union "could have taken" those grievances to arbitration under

the Staffing Article and Workload Distribution Provisions (discussed *supra*).  (Tr.

496:13–23, 520:2–21.)

### iii.    *Patient Care Article*

39.    *Second*, Article 27 of the Multi-Professional CBAs and its identical

counterpart Article 25 of the Mental Health CBAs are entitled "Patient Care" ("Patient

Care Article" or "PCA").  (Exs. 3 and 4, at Art. 27; Exs. 1 and 2, Art. 25.)

40.    The Patient Care Article states in its entirety:

The purpose of this provision is to set forth the understanding reached by
the parties with respect to staffing and related issues.

The parties recognize their mutual and ethical responsibility to provide
sufficient staffing to meet quality standards of patient care, workload, and
other issues affecting patient care, including, but not limited to, assuring
adequate coverage, sick replacement, overtime, and to assure that no
employee is required to work in any situation in which his or her license is
threatened or places any employee or patient in danger.

To that end, Kaiser shall provide sufficient staffing to address quality of
standards of patient care and provider workload including safe coverage.

The parties expressly agree that any disputes arising under this provision
of the collective bargaining agreement shall not be subject to the
grievance arbitration procedure outlined in [the Resolution/Grievance
Procedure Article].

(*Id.*)

41.    The language in the Patient Care Article was first proposed by the Union

at the bargaining table in or around 2000 and was ultimately agreed to by Kaiser.  It has

remained in each successor agreement since 2000.  (KPF&C ¶ 62; UPF&C ¶ 6; Tr. 638:15–25.)

42.     Dr. Joan Heller is a certified optometrist ("O.D.") who has worked for Kaiser since 1992.  She has been on the bargaining team for every local negotiation since 1994.  Heller is now employed by Kaiser as a labor liaison, serves as chief steward of the multi-professional bargaining unit for Local 7, and is second vice president on the Union's executive board.  (Tr. 633:16–635:25; UPF&C ¶¶ 242–245.)

43.     Heller testified that bargaining in 2000 was "difficult."  The parties did not reach an agreement by the end of the term of the preceding CBA, and the multi-professional bargaining unit went on strike for 21 days.  (Tr. 636:8–12; UPF&C ¶ 247.)

44.     The final outstanding item in the parties' negotiations was the patient care language.  Heller testified that the Union proposed the language that became the Patient Care Article in 2000 because "[w]e wanted to make sure that we had a voice in patient care."  (Tr. 636:13–25, 639:1–6.)

45.     Heller testified at trial as to her recollection of what certain phrases in the PCA meant to Local 7's bargaining team at the time of its adoption:

a.     "[Q]uality standards" "are principles that you learn in school when you're in [] healthcare . . . what kinds of things equal quality standards of care. . . ." (Tr. 685:4–24);

b.     Specifically, "quality standards of patient care" "is a set of principles that healthcare workers have to enable them to really focus on patient safety and the quality of care" and "allows for people to look at things from the patient perspective . . . ." (Tr. 639:16–24);

c.      "[Q]uality standards of workload"[3] "was really about making sure that workload was manageable" because "if workload is too high and there's not enough time to take care of patients, or there's too many patients, you as a healthcare worker feel rushed," and "that's when mistakes can happen. . . .  It creates problems with . . . decision-making" and "[i]t's harder to really focus on what you need to do for that patient and keeping that patient safe when you have so many that you're doing at a time," (Tr. 639:25–640:14);

d.      "[A]dequate coverage" meant "there was enough staff to take care of the patients that we had" and "allow[ing] for someone else to be present to take care of [a provider's patients]" when they are on leave, including when they are out sick, on vacation, or need to attend continuing education, (Tr. 640:15–641:8);

e.      The phrase, "assure that no employee is required to work in any situation in which his or license is threatened," was meant "to assure that . . . [Local 7 providers] aren't put in a situation where we have burnout or exhaustion or things like that, because those kinds of things create lots of opportunities for errors and mistakes" and "patients can be harmed."  Heller elaborated that a provider's license "can be threatened by reporting to any of the agencies that exist, state boards, the Medicare, Medicaid boards, things like that," which can "revoke [providers'] licenses," or, if a patient is harmed and threatens to report a provider, it threatens their license "[w]hether that actually happens or not."  (Tr. 641:9–24.)

46.      Finally, with respect to the final clause of the PCA, Heller testified that the Union bargaining team meant to distinguish the PCA from the grievance and arbitration

---

[3] The Court notes that this exact phrase does not appear in the PCA.  (*See* ¶ 40 *infra*.)

process in the Resolution/Grievance Procedure Article because the PCA "was not limited to a single department[,]" individual, or job classification. Rather, the PCA "was about a system-wide issue . . . ." (Tr. 644:11–22.)

47.     When questioned regarding the type of dispute resolution process the Union bargaining team contemplated under the PCA, if not arbitration, Heller testified that "we had high hopes that . . . we'd be able to communicate more openly and get things done . . . [but] I think we understood that if it couldn't go to arbitration, that there was other ways that it could be effectuated." (Tr. 645:23–14.)

48.     Initially, Heller testified that she had not "learned" that disputes under the PCA could be resolved in federal court until 2002, when the Union filed a federal lawsuit against Kaiser for breach of the PCA. (Tr. 645:14–16 ("I learned that in, I think 2002, something came up like this, *and at that point*, I understood that that meant federal court.") (emphasis added).)

49.     She then added she "believe[d]" federal court litigation "was discussed across the table with management" when negotiating the PCA. (Tr. 645:17–21.)

50.     With respect to the 2002 lawsuit, Heller recalled that "it was decided by a judge that it was not in arbitration, that it would go to court," although the lawsuit ultimately settled outside of court after Kaiser agreed to provide additional staff to the relevant department. (Tr. 647:23–648:9.)

51.     Notwithstanding, Heller acknowledged that the PCA does not contain language explicitly limiting its application to "systemic or system-wide issues," does not specifically define "sufficient staffing," and does not identify the "quality standards of patient care." (Tr. 681:16–682:14, 684:23–685:24.)

52.    There is no evidence of what the various phrases in the Patient Care

Article meant to Kaiser's bargaining team in 2000.

53.    Since the addition of the PCA in 2000, the workers have not gone on

strike and the parties have not revisited the PCA language in subsequent negotiations.

(Tr. 637:11–13, 648:13–18; UPF&C ¶ 251.)

### iv.    Staffing Article

54.    *Third*, Article 26 of the Multi-Professional CBAs and its identical

counterpart Article 24 of the Mental Health CBAs are entitled simply, "Staffing"

(collectively, the "Staffing Article").  (Exs. 3 and 4, at Art. 26; Exs. 1 and 2, at Art. 24.)

55.    The Staffing Article provides, in its entirety:

> The Parties recognize our mutual and ethical responsibility
> to provide sufficient staffing to meet quality standards of
> patient care.  It shall be the responsibility of the Medical
> Office Director (MOD) or equivalent, in collaboration with the
> Local 7 designee and other pertinent employee group
> representatives to ensure that staffing related issues are
> addressed with consensus.  An employee may call a
> member of the regional committee directly to address a
> staffing issue and file a staffing concern form.
>
> The staffing concern form shall be referred to the staffing
> committee.  The staffing committee will provide notice to the
> Area Leadership Team, if one exists, and the staffing
> committee may leverage the UBT and/or the Area
> Leadership Team to work to resolve the issues.  The staffing
> committee may also utilize its current processes to resolve
> the concern.
>
> This regional committee shall consist of, but is not limited to
> three (3) members designated by Local 7 and three (3)
> members designated by Kaiser Permanente.  This
> committee shall continue to meet throughout the term of this
> Agreement.
>
> The regional committee is responsible for reviewing the
> appealed staffing issues and reaching consensus on an
> appropriate staffing option.  The committee shall consider

> implementation of the staffing solutions regarding safe coverage while employees are off due to vacation, illness, or other leaves of absence, and to assure that employees are able to take rest periods, lunches, and vacations.
>
> The committee shall attempt to reach consensus on all issues.  If consensus is reached, the solution shall immediately be implemented.  If consensus cannot be reached, the matter may be submitted to arbitration.  The arbitrator's authority shall be limited to issuing a decision on whether or not either party's position is unreasonable, and to make recommendations as to what the parties shall consider in resolving the dispute.  In addition, the arbitrator shall be allowed to remedy violations with an award of penalty payments to the grievant(s).

(*Id.*)

56.    Notably, the Staffing Article did not exist as a standalone article in the 2000–2003 Multi-Professional CBA.  (*See generally* Ex. 5.)

57.    However, Heller testified that, in 2002, the parties "added a bunch of the letters of understanding [they] had had for a long period of time into the [Multi-Professional CBA]."  One such LOU, entitled "Staffing" and dated March 2, 2000, mirrored the Staffing Article in all material respects ("Staffing LOU").  (Tr. 647:1–6; Ex. 5 at KP_CPMG_003207.)

58.    Heller explained that, in successive negotiations, the Staffing LOU was "taken from being a letter at the end of the contract and . . . memorialized as an article" between the Resolution/Grievance Procedure Article and Patient Care Article.  (Tr. 647:7–19.)

59.    Consistent with the procedures set forth in the Staffing Article, one of the primary ways the Union has historically raised staffing concerns is through a jointly administered staffing committee, which reviews and investigates staffing concerns submitted by Local 7 members.  (KPF&C ¶¶ 74–75; UPF&C ¶ 11; Tr. 34:4–21.)

60.     Stephany Mitchell became a member of the staffing committee in 2017 and the management representative Co-Chair of the committee in 2019.  Mitchell has been an RN since 2007 and holds a master's degree in nursing and in business administration.  She began working for Kaiser Colorado in December 2010 and, in January 2020, became Regional Director of Urgent Care.  Mitchell stayed in the Co-Chair role until February 2023, when she transferred to Georgia.  She is currently the Senior Director of Operations of Kaiser Georgia's Ambulatory Care Delivery Operations and Medical and Procedural Specialties.  (KPF&C ¶ 78; Tr. 710:14–24.)

61.     Throughout Mitchell's tenure as Co-Chair, Union Executive Board Officer Becky Sassaman was her labor representative Co-Chair counterpart.  Sassaman is also an RN and has worked for Kaiser since 1990.  In addition to serving as Co-Chair of the staffing committee, Sassaman is Local 7's lead RN and recording secretary.  (KPF&C ¶ 79; UPF&C ¶¶ 12–13; Tr. 30:21–31:20.)

62.     Both Mitchell and Sassaman testified at trial as to the basic procedures of and matters handled by the staffing committee based on their experience as the committee's Co-Chairs.

63.     Sassaman defined the Staffing Article as, "[i]n general, [the parties'] agreement about how we will address staffing issues at Kaiser Permanente."  (Tr. 33:25–34: 3.)

64.     The committee's work is driven by a "staffing concern" form submitted by the Union.  (*See, e.g.,* Ex. 16; KPF&C ¶¶ 82, 85.)

65.    Mitchell testified that, while staffing concern forms could be about a specific location, they were typically region-wide for a particular service line or market. (Tr. 768:8–19.)

66.    Mitchell also testified that it was typical for staffing concern forms to ask for additional staff or request additional FTE.  (Tr. 716:25–717:9; KPF&C ¶ 93; *see also, e.g.,* Ex. 17 (requesting additional 1.0 FTE for Rock Creek Hearing Services); Ex. 20 (asking for FTE to be increased in Behavioral Health from 46.9 to 75 FTE); Ex. 21 (asking for additional 0.8 FTE at Wheat Ridge Primary Care); Ex. A64 (asking for FTE to be increased in Behavioral Health from 46.9 to 94).)

67.    The staffing committee was only empowered to investigate staffing concerns and make recommendations to Kaiser regarding changes in FTE or other operations; it was not empowered to add FTE or implement other recommended changes.  (KPF&C ¶ 77; UPF&C ¶ 11(b); Tr. 721:1–22, 764:5–20; *see also, e.g.,* Ex. 45.)

68.    After the Union escalated a staffing concern, Union leaders—usually Nate Bernstein and/or Sassaman—would request a meeting with the administrator of the applicable service line or department.  Mitchell could not recall a time that management and the Union did *not* meet after a staffing concern was escalated.  (KPF&C ¶¶ 94, 95.)

69.    The committee had standing monthly meetings, which would often last for three to four hours.  During these meetings, the committee worked off of a staffing log that dated back before 2010 when Mitchell joined Kaiser.  (KPF&C ¶¶ 86, 87; *see also,* Exs. 18, 19.)

70.     Sassaman testified one of the goals of the committee is to try to reach consensus and resolve the staffing concerns that come before it.  (Tr. 91:14–17.)

71.     The committee sometimes succeeded in addressing workflow and interpersonal issues, with staffing requests often including a mix of FTE additions and workflow adjustments.  (Tr. 758:7–25; KPF&C ¶¶ 84, 89.)

72.     Other times, the committee members disagreed on a resolution.  (KPF&C ¶ 91.)

73.     Mitchell often felt that the Union was not vested in coming up with a viable solution to resolve the staffing concerns.  (KPF&C ¶ 83.)

74.     If the parties could not reach consensus, the next step would be for the Union to escalate the concern to a senior leader.  If the escalation did not resolve the concern to the Union's satisfaction, the Union could demand arbitration.  (KPF&C ¶¶ 92, 97; Tr. 47:17–21, 91:18–25.)

75.     Under the Local CBAs, it is fully within the Union's discretion whether to submit a staffing concern to arbitration.  (Tr. 766:17–767:8.)

76.     However, Mitchell cannot recall a single time during her tenure on the committee that the Union demanded arbitration.  (KPF&C ¶ 98.)

77.     Sassaman does not know whether any of the staffing concerns reflected in the Staffing Committee Logs at Exhibits 18 and 19 were pushed forward to arbitration by the Union.  (Tr. 92:17–93:14.)

78.     After this lawsuit was filed in October 2021, Kaiser representatives were advised by legal counsel not to discuss staffing concerns that were named in the suit.

Based on this guidance, Kaiser paused the staffing committee meetings until the spring of 2022.  (Tr. 726:24–727:8; Ex. 81.)

79.     Mitchell continued to send the staffing concerns to senior leaders of the relevant departments to investigate them, follow up with them to obtain the resolutions and findings, and record any follow-up management investigations in Kaiser's own staffing log.  (Tr. 728:10–15, 774:17–25; 775:1–25; KPF&C ¶ 99.)

80.     However, these investigations were done without input from Union committee members.  Heller informed Mitchell that the Union believed pausing the Committee meetings was a violation of the parties' contracts.  (Tr. 727:12–728:9, 776:1–10.)

81.     Sassaman also testified that, even once the staffing committee meetings resumed in the spring of 2022, they were "not meaningful."  (Tr. 51:14–53:2.)

82.     She testified that, in general, Local 7 has engaged in the parties' agreed-upon procedures for reporting and escalating concerns about insufficient staffing—taking issue with the staffing levels in specific departments across a variety of Kaiser facilities and working through the staffing committee's procedures—to little or no avail.  (*See, e.g.,* Tr. 47:16–21.)

> ### v.    *Workload Distribution Provisions*

83.     *Fourth,* the Multi-Professional CBAs also include an article entitled "Workload Distribution/Replacement Procedure" ("Workload Distribution Article"), which directly follows the Patient Care Article.  (Exs. 3 and 4, at Art. 28.)

84.     The Workload Distribution Article provides:

> The Employer and the Union agree that it is important to address workload distribution and replacement issues as quickly as possible.

The Regional Staffing Committee will investigate workload distribution and replacement complaints and present their findings and recommendations at a meeting with the appropriate level of management.  Said meeting will be scheduled within thirty days of the request, unless mutually agreed to otherwise.  If the appropriate level of management cannot meet in that timeframe, a comparable alternate will be designated.  A written response should be made to the Committee within sixty days of the meeting.

Should the Union find the solution unacceptable, the issue may be advanced directly to an expedited arbitration procedure.

Said expedited arbitration procedure shall be conducted in accordance with the provisions of [the Resolution/Grievance Procedure Article] with the following exceptions:

> 1)    The Parties agree to utilize their best efforts to schedule the arbitration within 60 days.
>
> 2)    The Parties agree to attempt to develop a standing panel of arbitrators whose selection shall be determined with consideration given to the arbitrator's willingness to schedule a hearing and issue a decision on an expedited basis.

(*Id.*)

85.    The Mental Health CBAs notably do not include an equivalent standalone article.  However, appended to the Mental Health CBAs is an LOU identically entitled "Workload Distribution/Replacement Procedure" ("LOU 14") (together with Article 28 of the Multi-Professional CBAs, "Workload Distribution Provisions"), to which the parties agreed in or around 2011.  (Ex. 1 and 2, at LOU-14.)

86.    LOU 14 is identical to Article 28 of the Multi-Professional CBAs in all material respects, excepting that it provides "a Joint Labor Management Committee" (as opposed to the "Regional Staffing Committee") will "investigate workload distribution and replacement complaints . . . ."  (*Id.*)

vi.       *LOU 8*

87.     *Fifth* and finally, appended to the Mental Health CBAs is an additional

LOU entitled "Mental Health Services Committee" ("LOU 8"), to which the parties also

agreed in or around 2011.  (*See* Exs. 1 and 2, at LOU-8.)

88.     LOU 8 establishes a Mental Health Services Committee, separate and

apart from the staffing committee contemplated under the Staffing Article.  It is a "cross-

functional work team" "consist[ing] of 8 people employed by Kaiser Permanente,"

including "[t]he Regional Department Chief (RDC) [as] the physician representative,"

three providers elected by the bargaining unit, one RN elected by the nurses, one

supervisor selected by Kaiser, and one analyst.  The Committee is "Co-chaired by the

Director and one of the Local 7 providers."  (*Id*.)

89.     LOU 8 provides that:

> The cross-functional work team is authorized to analyze in a
> systematic way the Mental Health Services offered.  The top
> priority initially will be workload issues, to include number of
> intakes, initial and return visit access, no shows and
> treatment practices.  Clinical and business recommendations
> will be data driven, based on objective criteria such as
> market forces and professional standards.
> Recommendations will be consistent with the principles of
> the organization to provide high quality health care and
> service, in a cost-effective way.  Recommendations that
> have an economic impact on the department will be
> presented to upper management.
>
> Mental Health professionals who are members of a
> recognized profession, such as professional psychology or
> clinical social work, are obligated to adhere to the respective
> profession's code of ethics in all their activities.  A code of
> ethics has, as its primary goal, the welfare and the
> protections of the individuals and groups with whom mental
> health professionals work.
>
> Management agrees to release providers from patient care
> duties for this committee work.  The committee shall attempt

to reach consensus on all issues.  Whenever this cannot be accomplished, disputes may be submitted to arbitration.  The arbitrator's authority shall be limited to issuing an award to whether or not each party's position is reasonable or unreasonable.

(*Id.*)

90.  With specific regard to "Caseload Grievances,"

[t]he employer and the Union agree that it is important to address equitable caseload distribution, including but not limited to intakes, return visits, and acuity, as quickly and expeditiously as possible.

To this end at the request of the union, the Director of Behavioral Health and a supervisor designated by the Director will meet with the affected employee and his or her Union representative to investigate the complaint and make a recommendation to the Director of Operations Support. This meeting will be scheduled within thirty (30) days of the request, unless mutually agreed otherwise.

The Director of Operations Support will review the recommendation and either accept or modify the recommendation.

Should the Union find the solution unacceptable, the issue may be advanced directly to an expedited arbitration procedure as agreed to by the parties.

(*Id.*)

91.  Patrick Brenner is a licensed therapist who has worked for Kaiser in its behavioral health outpatient department since 1999.  Brenner has been Chief Steward of the mental health bargaining unit for around fifteen years.  In this role, he has been responsible for educating and advocating for Union members, representing members in discipline and corrective action cases, participating in regional staffing committees, and engaging in the labor-management partnership process to address efficiency issues within Kaiser.  (Tr. 265:18–266:3, 267:4–12; UPF&C ¶¶ 79–81.)

92.     Brenner has also served on the Mental Health Services Committee for at least 15 years.  He described it as a "catch-all committee" that "is supposed to address quality care, patient care, staffing, [] access issues, and workload issues" and has been in existence for at least two decades.  (Tr. 289:24–290:2, 306:11–307:4.)

93.     The committee typically meets monthly for one to two hours, with management, labor leadership and Union stewards, and CPMG physicians in attendance.  (Tr. 290:6–13, 300:22–25.)

94.     Like the staffing committee, the Mental Health Services Committee attempts to reach consensus on all issues and if consensus cannot be reached, the dispute may be submitted to arbitration.  (Tr. 307:5–15; Exs. 1 and 2, at LOU-8.)

95.     Brenner testified that, in the 15 or more years he has been on the Committee, the Union has taken one or two matters submitted to the Mental Health Services Committee to arbitration.  (Tr. 307:17–21.)

**C.      Transformation**

96.     Between 2015 and 2018, Kaiser's cumulative total financial loss was half a billion dollars.  In 2018, Kaiser lost almost $240 million.  (KPF&C ¶ 13.)

97.     In 2018, Kaiser had 556,000 members; by 2019, that number had dropped to 517,000, and today, Kaiser has 455,000 members.  Members are a significant source of Kaiser's revenue.  (KPF&C ¶¶ 9, 14.)

98.     Kaiser's financial position was so bleak, it seriously considered selling Kaiser to other markets or closing its Colorado operations altogether.  That has happened to three other Kaiser Permanente regions, including Kaiser Ohio, Kaiser North Carolina, and Kaiser Texas.  (KPF&C ¶¶ 15, 16.)

99.    Instead, Kaiser went through a "Transformation" in 2018 and 2019, led by the newly created "Transformation Office," which included a dramatic reorganization of its operations.  (KPF&C ¶¶ 18–19.)

100.    Among other actions, Kaiser eliminated approximately 20% of its Local 7 and Local 105-represented providers through a formal reduction-in-force process guided by the parties' CBAs.  Between 150 and 160 Local 7 provider roles were terminated.  (KPF&C ¶ 27; Tr. 875:10–16.)

101.    Affected Local 7 employees were given three options to stay employed at Kaiser: (1) during the notice period of potential layoff/displacement, they could be placed into an open position for which they qualified, almost qualified, or would qualify within 90 days; (2) they could displace or bump less senior employees in their job classification; or (3) they could move into transition status under the parties' Employment and Income Security Agreement ("EISA"), which allows an employee to remain employed for one year with full pay and benefits, during which time they could choose to bid into other vacant positions in their field for which they qualified or be placed into a comparable position.  (KPF&C ¶ 28.)

102.    The EISA option was also offered to Local 7 employees displaced by more senior employees.  (KPF&C ¶ 30.)

103.    All Local 7 employees involved in patient care delivery who chose the EISA option were placed or bid into new positions.  (KPF&C ¶ 29.)

104.    Alternatively, Local 7 employees could choose not to remain employed at Kaiser and instead accept an "enhanced severance" that offered up to 12 months of pay

and full benefits, double the maximum six months of severance guaranteed to separating employees in the parties' 2018 Local CBAs.  (KPF&C ¶ 31.)

105.    Without the Transformation, Kaiser Colorado's existence as a viable entity was threatened.  If it had closed, over half a million patient-members would have been left without healthcare and all of the Health Plan's approximately 5,000 employees would have lost their jobs.  (KPF&C ¶ 17; Tr. 855:3–19, 856:1–857:1, 860:21–861:10.)

106.    Still, the Union did not agree with many of the ways Kaiser implemented the Transformation.  (Tr. 657:18-25.)

107.    Based on the totality of the evidence, it is the Court's view that the Transformation, coupled with challenges posed by the COVID-19 pandemic beginning in 2020, was a substantial catalyst for the staffing issues highlighted by the Union at trial in Kaiser Colorado's Primary Care, Message Management, Urgent Care, Pharmacy Services, and Behavioral Health Services Departments.

**D.    Primary Care Staffing**

108.    The Transformation included a reorganization of Kaiser's largest service line, Primary Care, which Kaiser called the Primary Care Optimization ("PCO"). (KPF&C ¶¶ 125–126.)

109.    In summer 2019, the Transformation Office brought in Dr. Mena Yaft as the new leader of Kaiser's Primary Care, Pediatrics, and Urgent Care service lines to implement the PCO.  Yaft continues to work for Kaiser as the Executive Director of Primary Care, Pediatrics, Urgent Care, Message Management, Telehealth, and Patient Registration Associates and has held this position for approximately two years. (KPF&C ¶¶ 131–133.)

110.    The goal of PCO was to create an operationally efficient Primary Care delivery model to better meet patient care by increasing access and efficiency, removing waste, and centralizing where possible, while maintaining affordability. (KPF&C ¶¶ 128–130.)

111.    To meet this goal, Yaft implemented several operational changes to Primary Care and made significant changes to its staffing model.  Summarized below are those changes addressed most substantially at trial.

### i.    Reduction in Part-Time Positions

112.    As part of PCO, Kaiser moved employees working part-time (less than 1.0 FTE) to full-time status (1.0 FTE).  (KPF&C ¶¶ 134–136; UPF&C ¶ 254; Tr. 867:20–25.)

113.    Dr. Greg Berman, the physician lead of the Transformation Office and later Chief Transformation Officer, testified this change was at least partly motivated by the fact that part-time Local 7 employees received full benefits pursuant to the Local CBAs, and Kaiser "simply could not afford to provide full benefits . . . to employees that weren't providing full-time work."  (KPF&C ¶ 20; Tr. 868:5–15.)

114.    The Union disagreed with Kaiser's decision to force long-term part-time employees to convert to full-time positions.  (UPF&C ¶ 254(a).)

115.    Historically, the Union has encouraged Kaiser to offer part-time positions to promote work-life balance and provider retention.  (Tr. 190:16–191:18.)

### ii.    Provider Template & Patient Panel Expansions

116.    One of Kaiser's goals is for patients to be able to access care within three days.  In furtherance thereof, Yaft increased daily hours in Primary Care clinics (in most cases from 8 a.m.–5 p.m. to 7 a.m.–7 p.m) and added Saturday hours to more clinics

(usually 8.a.m. to 12 p.m. or later) to give patients weekend access to care.  (KPF&C ¶¶ 140–141, 147.)

117.    To in turn accommodate increased clinic hours and days open, Yaft reset standards to conform with other Kaiser regions that had much higher productivity, including Kaiser Southern California, Kaiser Northern California, Kaiser Mid-Atlantic, and others.  (KPF&C ¶¶ 148–149.)

118.    In these other regions with similar models of patient care, Primary Care providers see more patients each day.  Thus, PCO increased the "template" of Primary Care providers, which is used to plan out a provider's day.  (KPF&C ¶¶ 150–151, 153.)

119.    By increasing the number of patient slots on a provider's template, Kaiser was asking these providers to see an increased number of patients per day.  Pre-PCO, for example, Advanced Practice Providers ("APPs") had 14 to 16 patient slots per day. Post-PCO, APPs had up to 18 patient slots per day, and then later 21.  (KPF&C ¶¶ 155–157; Tr. 936:2–5.)[4]

120.    After the template increase, the time per patient visit remained at 20 minutes on average, with some exceptions for 40-minute appointments.  This 20-minute appointment slot does not account for time spent rooming the patient or "service recovery," when providers must address patient dissatisfaction due to access issues or negative interactions.  Yaft's expectation was that those functions were performed by administrative staff, not providers.  (Tr. 936:10–13, 940:6–11.)

_____

[4] No-shows and cancellations are not double booked, so if a provider has a template of 20 patients per day and that provider averages 2 no shows, the provider will only see an average of 18 patients per day.  (KPF&C ¶ 153.)

121.    Separately, both pre- and post-PCO, physicians are responsible for the ongoing healthcare of a specific group of patients assigned to them, referred to as their "patient panel."  Pre- and post-PCO, only a few (6 and 5, respectively) APPs also had patient panels.  (KPF&C ¶¶ 158–159, 165.)

122.    PCO created a staffing model for paneled providers with a ratio of 2,000 patient members to one physician and 1,500 patient members to one APP.  Yaft testified that a ratio of 2,000 patients to one doctor is consistent with other Kaiser regions as well as entities outside of Kaiser.  (KPF&C ¶ 166; Tr. 899:19–900:9.)

123.    After taking into account additional inputs predictive of the supply of paneled providers and patient demand, the staffing model tells Kaiser how many appointments Kaiser will provide in one year.  (Id.)

124.    The staffing model is "purely about patient demand" and does not take into account "medical errors," "negative patient outcomes," or "patient safety," which Yaft testified were measured "other mechanisms."  (Tr. 932:1–12.)

125.    Non-paneled providers (with LPN or Medical Assistant ("MA") support) handle "convenience care" visits—low acuity, same-day, and/or walk-in patient visits or appointments that include caring for overflow paneled patients, patients with a cold or flu, patient education, immunizations, and low-acuity procedures (e.g., injections or wound care).  (KPF&C ¶¶ 169–171.)

126.    In 2019, Kaiser laid off 55 APPs from Primary Care because, according to Yaft, "[t]he staffing model at that point showed that [Kaiser] had a sufficient number of APPs . . . ."  (Tr. 950:13–22.)

127.    At least two Local 7 APPs testified at trial regarding the impact of the staffing cuts and expansions to provider templates and patient panels on their patient care delivery.

128.    Jennifer Walker is a certified PA who has worked for Kaiser's Primary Care department since 2017.  She is a Union member but is not a steward and expressed nervousness about testifying against her employer.  (UPF&C ¶¶ 105–106; Tr. 326:7–13.)

129.    Walker worked at Kaiser's Castle clinic in Castle Rock, Colorado between 2017 and 2019.  She testified that she was specifically hired to work at that clinic because it "had more patients than they had providers to panel" and had been characterized as a "distress clinic."  (Tr. 327:16–23; UPF&C ¶ 107.)

130.    Walker recalled that the Castle Rock clinic had about 15,000 to 18,000 patient members but only 4.75 FTE providers.  So, although the standard primary care provider panel was between 1,800 and 2,000 patients, only roughly 10,000 patients were able to be paneled.  (Tr. 328:8–16.)

131.    This left 5,000 patients unpaneled, or with no assigned provider.  Walker and one other APP were responsible for all unpaneled patients.  (Tr. 328:11–329:17; UPF&C ¶ 111.)

132.    The increase in appointment slots from 16 to 18 per day in or around 2019 further worsened Walker's workloads.  For instance, patients often had complex conditions requiring extended visits, which would delay all subsequent appointments. (Tr. 330:5–331:25.)

133.    As a result, Walker often worked through lunch, through breaks, and stayed past clinic hours.  To her recollection, she accrued overtime every week of 2018 and 2019 to accommodate patients.  (Tr. 332:1–17.)

134.    Further complicating matters, Walker testified that "getting too much overtime is frowned on" by management, and employees who worked overtime without preapproval are subject to punitive discussions called "JODs."  (Tr. 332:10–333:12.)

135.    Amy Inglis is a licensed PA who has worked for Kaiser since 2003.  She began working in Primary Care in 2008 and continues to see patients in the Smoky Hill clinic.  Since 2021, Inglis has served as the contract specialist for the Union, in which role she helps to enforce the Local CBAs and advocate on behalf of Union members. (UPF&C ¶¶ 233–235; Tr. 549:21-22, 550:3–551:10, 552:9-11.)

136.    Inglis testified that, before the Transformation, APPs in Primary Care had "desktop medicine time" ("DMT") to review charts, order labs and x-rays, and conduct outreach to specialists.  (Tr. 583:7–584:14; *see also* Tr. 938:16–939:25.)

137.    However, to accommodate the increase in provider templates, the Transformation "significantly decreased" DMT.  (Tr. 584:2–14; *see also* Tr. 937:16–23 (Yaft testified that "part of that increasing of the template without decreasing appointment time was cutting the [DMT]" because "APPs without an assigned panel . . . need a lot less").)

138.    Inglis explained that, as a result, now when she goes in to see a patient she has "had no opportunity to review their charts or their medications" and is "basically walking in blind . . . ."  Inglis testified this makes it "easier to miss things," particularly

given the increasing frequency with which she is treating patients she has never seen

before.  (Tr. 584:6–585:11.)

139.    Yaft testified that Kaiser aimed for an 80% success rate in offering primary

care appointments within three days.  He estimated that, in 2023, the average days wait

"ranged . . . from six to 10.6 [days] . . . ."  (Tr. 963:8-13, 964:3–10.)

### iii.    Float Pool

140.    Another change made during PCO in 2019 was the creation of a float pool

to provide backfill for sick calls and other provider leaves.  (KPF&C ¶ 142.)

141.    Primary Care has a float pool for APPs and a separate float pool for RNs,

LPNs, and MAs (those that support the providers).  (KPF&C ¶ 143.)

142.    Historically, Local 7 providers take approximately 12%–15% of time off

annually.  Accordingly, Yaft staffed the float pool with 12% FTE to backfill Primary Care

clinics across Colorado.  (KPF&C ¶¶ 144–145.)

143.    Yaft was not in charge of the float pool directly during PCO but testified

that he learned "through previous conversations with the [U]nion that Sharon Peters,

[Kaiser's] previous COO," had set an unofficial 70% fill rate goal for the float pool.  He

did not have data on whether the float pool ever met that goal.  (Tr. 958:6–16; 960:25–

961:6-10.)

144.    However, Heller and Walker testified at trial regarding their perspectives

on the efficacy (or rather, inefficacy) of the RN and APP float pool post-Transformation.

145.    For her part, Heller testified that she jointly investigated "a regional float

pool staffing committee concern" with Mitchell and Pegah Rownaghi, the director of the

RN float pool, in or around late 2019.  (Tr. 668:19–669:5.)

146.    At that time, Rownaghi informed Heller and Mitchell that the "goal for backfill" for the RN float pool was to cover 80% of absences.  At that time, Rownaghi said they were only achieving 50%.  However, Kaiser was hiring "three to four RNs," so she expected that figure to improve.  (Tr. 669:6–14.)

147.    When Heller, Mitchell, and Rownaghi met two or three months later, the newly hired RNs had raised the float pool backfill rate to 60%.  Thus, Heller testified "it made an improvement, but if the goal was 80 percent, they were still understaffed according to what the director of the float pool was telling [her] they needed to be."  (Tr. 669:15–670:2.)

148.    Heller further testified to her understanding that some managers were not putting in requests for backfill from the float pool because they thought it would be futile, although she did not know how many managers did so.  (Tr. 673:18–674:9.)

149.    Yaft agreed this could mean the float pool backfill rates were artificially inflated insofar as the numerator of the backfill rate is how often an individual or a request is backfilled, and the denominator is how many requests for backfill are submitted.  I.e., if managers simply did not submit backfill requests, "[t]he denominator wouldn't be as accurate."  (Tr. 957:15:–21, 960:9–13.)

150.    According to Heller, the lack of float pool coverage created insufficient staffing in Primary Care, contributing to "a higher workload" and inadequate coverage for sick replacement.  She testified this "can ultimately create safety issues for the patient" due to providers being "exhausted or overworked."  (Tr. 675:4–676:2.)

151.    In the fall of 2019, Walker's position at the Castle Rock clinic was eliminated in the layoffs.  She was placed in EISA, during which time she worked in

Kaiser's float pool and traveled between clinics to fill staffing gaps. (Tr. 334:4–18, 338:5–16; UPF&C ¶¶ 119–120.)

152.    During her time in the float pool, Walker testified that she was informed where she needed to report for work the same morning, around 6:30 a.m., and would sometimes have to drive over an hour to arrive. (Tr. 336:20–337:13.)

153.    On those occasions, she would have to ask the float pool managers to "have [her] template held" because she could not arrive in time for a 7:30 a.m. shift start. Although "[t]hey never gave her a problem with doing that," it meant she had to arrive and orient to a clinic and full template of patients with which she was unfamiliar, while already beginning the day behind. (Tr. 337:3–13.)

> ### iv.    *Negative Patient Outcomes and Licensure Risk*

154.    Significantly, just as Kaiser and the Local 7 providers were adjusting to the changes in Primary Care, the COVID pandemic struck. At the end of March 2020, Kaiser closed most of its Primary Care clinics when Colorado's Governor ordered it to do so. (KPF&C ¶¶ 173–174.)

155.    Kaiser's historical data regarding patient demand and provider time off no longer applied. Providers were calling out sick in significantly larger numbers. Instead of in-person patient visits, the vast majority of patient care was virtual via telehealth. (KPF&C ¶¶ 175–177.)

156.    Yaft considered this data when he modified the staffing models during this period to accommodate the lower provider supply and increased patient demand. To assure adequate patient coverage in the clinics, Primary Care sometimes floated RNs or APPs in the float pool to other locations in need of providers. (KPF&C ¶¶ 178–179.)

157.    Yaft is not aware of any poor patient outcomes related to insufficient staffing.  (KPF&C ¶ 180.)

158.    Still, Local 7 Primary Care providers complained their licenses were put at risk during the pandemic.  (KPF&C ¶ 181.)

159.    During her time working in Primary Care, Walker's license has never been suspended or revoked, and she is not aware of any complaint made against her professional license.  (Tr. 353:9-17.)

160.    Inglis's professional license has also never been suspended or revoked, and she has not been subject to any disciplinary action for her license while employed at Kaiser.  (Tr. 625:5-9.)

161.    Other than the Health Plan's nursing executives whose nursing licenses were threatened when the Union brought State Board of Nursing ("SBON") complaints against them (discussed supra), Yaft is also not aware of any Local 7 provider whose license was threatened due to a staffing issue.  (KPF&C ¶ 182.)

162.    To nevertheless support the providers and ensure quality patient care, Kaiser instituted a Medical Alert Policy for all Kaiser employees.  (KPF&C ¶ 183.)

163.    Under that policy, if a provider feels that his or her license is at risk because they are being asked to work outside the scope of their license, they are asked to call 911.  If a call to 911 is made, an ambulance arrives, assesses the patient, and takes the patient to a higher level of care.  (KPF&C ¶¶ 184–185.)

*v.*    ***Prior Staffing Concerns and/or Grievances***

164.    Nissa Simmons is an RN who worked for Kaiser between 2009 and 2022. Before starting in the Message Management Department in 2019 (discussed supra), Simmons worked in Primary Care clinics.  Simmons was also a Union steward

throughout her employment at Kaiser.  (UPF&C ¶¶ 53–55; Tr. 160:9–18, 162:3–8, 19–25.)

165.    Simmons worked in the Rock Creek clinic before the Transformation.  She testified that staffing levels declined sharply over the years.  In 2010, the Rock Creek Clinic had between eight and nine RNs per day.  In 2013, staffing was reduced to five RNs per day.  By 2019, only two or three RNs per day remained.  (Tr. 169:2–16.)

166.    In or around April 2019, Simmons submitted a staffing concern regarding the resignation of two 0.8 FTE RNs in the Rock Creek clinic.  She wrote: "We are currently filling out our June schedule and most days we only have 2 RN's scheduled, when our baseline is 5 RN's scheduled per day.  I don't know what to do.  I feel like I am being put at risk and putting my license on the line and at risk by working with such short staffing and that scares me."  (Ex. 58; *see also* Tr. 169:17–171:21.)

167.    Simmons testified that she participated in a meeting at some point thereafter with other RNs in the Primary Care department and the Union to discuss the staffing concern.  (Tr. 176:3–6, 177:14–18; UPF&C ¶ 62.)

168.    However, to her knowledge, Kaiser never did anything long-term to address the staffing concern.  The Rock Creek clinic "sporadically got float pool help," but the two RNs who had left the clinic in or around 2018 and 2019 were never replaced.  (Tr. 180:1–11.)

169.    There is no evidence of whether the Union demanded arbitration on Simmons's April 2019 staffing grievance.

170.    As discussed *infra*, the staffing committee also investigated a staffing concern in or around late 2019 related to understaffing of the RN float pool.

171.    After the additional RNs only increased the float pool fill rate to approximately 60%, Heller testified she brought the staffing concern "back to the staffing committee [to] try to reach consensus on getting additional staff."  (Tr. 670:3–8.)

172.    The staffing committee was "unable to reach consensus," so the next step [was] to escalate" the staffing concern "to the healthcare director . . . ."  Heller testified that she did so escalate the concern but, to her knowledge, no additional RNs were added to try to increase the float pool's fill rate.  (Tr. 670:8–13.)

173.    There is similarly no evidence of whether the Union demanded arbitration regarding the understaffing of the RN float pool in late 2019.

174.    In October 2020, a Union member submitted a staffing concern related to understaffing in the Wheat Ridge Primary Care clinic.  The staffing committee was unable to reach consensus on a recommendation, and the Union accordingly escalated the staffing concern in January or February 2021.  (Ex. 18 at 30; Ex. 21; Tr. 47:16–48:25.)

175.    The escalation form described that the clinic was "understaffed to meet the needs of the patients they care for" and as a result "[s]taff have over time, missed lunches and breaks," and "are denied time off" and "back fill" is estimated at "less than 20%."  The Union's ultimate recommendations was "to provide safe staffing at the Wheat Ridge Primary Care office to take care of the patients and honor work life balance and earned benefit time off per the CBA for employees . . . ."  (Ex. 21; Tr. 47:16–48:25.)

176.    The request for additional FTE was denied by management in September 2021, but Sassaman did not know whether the Union ever demanded arbitration

thereafter.  (Tr. 93:25–94:21; *see also* Ex. 18 at 30 (log indicating "FTE denied" in September 2021).)

178. Although not all were specifically highlighted by the parties at trial, the staffing committee logs also show that, in 2019 and 2020, the staffing committee was investigating at least six additional staffing concerns related to understaffing in Primary Care.  (*See generally* Ex. 19 at 1–4; Ex. 18 at 30.)

178. Sometimes, but not always, these staffing concerns also expressly mentioned concerns about the quality or timeliness of patient care or patient safety. (*See, e.g.,* Ex. 18 at 30 (October 2020 staffing concern describing Union member's experience having to call an ambulance for a sick patient experiencing shortness of breath).)

179. To the extent the staffing committee was unable to reach consensus on a resolution, there is no indication of whether the Union ever demanded arbitration as to any of these additional concerns.  (*See generally* Ex. 19 at 1–4; Ex. 18 at 30.)

**E.    Message Management Staffing**

180. Before the Transformation, patient messages were routed directly to the Primary Care clinics, meaning patient messages were commonly answered by patients' treating provider(s) and care teams.  (Tr. 1022:19–1023:6, 1028:8–14.)

181. PCO instead created a centralized Message Management Department to handle incoming patient calls (messages were taken then converted to an internal e-mail) and e-mails.  Thus, at least until Message Management's reorganization in 2022, patient messages were no longer handled in clinics but instead funneled through the Message Management Department.  (KPF&C ¶ 146; Tr. 1024:7–22.)

182.    Greg Mills, current Executive Director of Ancillary Services, oversaw the implementation of Message Management during the PCO and through the reorganization of Message Management in 2022.  In 2019, Mills was the Regional Area Administrator for Clinical Support Services.  (KPF&C ¶ 187.)

183.    The centralization of Message Management was designed to create a consistent and standard approach to virtual, e-mail, and phone message response across all 28 of Kaiser Colorado's Primary Care Medical Office Buildings.  It allowed for consistent metric oversight, including volume of messages, average age of messages, one touch rate (number of messages that providers only have to touch once), and screening rate (number of messages addressed by staff only without a provider touching the message).  (KPF&C ¶¶ 197–198.)

184.    Message Management was implemented across Kaiser's Primary Care clinics in two phases in the fall of 2019.  Initially, it consisted of a centralized team of APPs, RNs, and LPNs/MAs.5  (KPF&C ¶¶ 186, 195–196.)

185.    RNs had defined responsibilities different from those of the LPNs and MAs because of the higher scope of the RN license.  In particular, several witnesses testified to the effect that if a patient needs "a triage, an assessment, a care plan, then that is a role of [an RN]" and outside the scope of an LPN.  (UPF&C ¶ 31; Tr. 129:1–8; *see also* Tr. 1037:12–16 (Mills testifying LPNs and MAs cannot triage patients).)

186.    After Message Management's implementation, patient messages were funneled through the Department from various sources.  (UPF&C ¶ 34.)

---

[5] LPNs have their own union and are not represented by Local 7. (Tr. 130:14–16.)

187.   Incoming patient calls to Kaiser's general phone line were picked up by Call Center Service Associates, who were not required to have any medical training, certification, or licensure.  (KPF&C ¶ 203; Tr. 193:11–13; 1031:22–1032:2, 1032:18–1033:8.)

188.   The Service Associates transferred patients reporting "red flag" symptoms (specific symptoms that require prompt medical attention) directly to the Nurse Advice Line ("NAL") RN team for triage.  (KPF&C ¶ 204.)

189.   All other patient questions or concerns that could not be handled by the Service Associate directly (i.e., matters beyond scheduling an appointment) generated a "telephone encounter message," which was then routed to the Message Management team for review or callback.  (KPF&C ¶ 205; *see also* Tr. 109:2–4, 1036:13–23.)

190.   Those messages were first routed to the LPNs and MAs, who reviewed the messages to determine whether the patient concern was something they could assist the patient with directly, whether the message contained red flag terminology and needed to be forwarded to an RN for urgent review, or whether the message required physician-level review and should be routed directly to the physician provider.  (Tr. 1036:24–1037:2–17.)

191.   Patient e-mails were handled similarly: an LPN would review the e-mail and then forward it to the physician or APP.  (KPF&C ¶ 206; *see also* Tr. 109:2–7.)

192.   The RN expectation for number of messages responded to during an 8-hour shift was 22 messages per shift.  This included responding to non-urgent e-mail messages within three business days, responding to routine phone messages (appointments, regular prescription refills, etc.) within four hours, responding to high

priority phone messages within two hours, and high priority email messages within four hours.  (KPF&C ¶¶ 200–201; Exs. A2, A3.)

193.    This was less than the expectations of the other Kaiser regions in the enterprise that utilized the same Message Management model, including the Mid-Atlantic region (125 messages for remote RNs and 25–75 messages for RNs in-clinic), the Northwest region (50–100 messages), and Washington (25–75 messages). (KPF&C ¶ 202.)

### i.    *Insufficient Staffing*

194.    During the roll out of PCO, there were 16 RN and LPN positions vacant within the Message Management department.  All of those positions were onboarded during the weeks of November 11 and 18, 2019, and recruiting and hiring continued beyond these dates.  (KPF&C ¶¶ 207–208.)

195.    Nevertheless, two Local 7 RNs and one APP staffed in Message Management testified at trial that they experienced ongoing issues related to understaffing and high message volumes, which continued into 2022.

196.    LaVonne Harris is an RN who worked in Message Management from its inception.  She is a Union steward and has been a Kaiser employee since 2008.  Harris also served as a team lead and preceptor responsible for training and onboarding of RNs in Message Management.  (Tr. 107:15–109:17, 113:17–18; UPF&C ¶¶ 29–30.)

197.    Harris testified that, when Message Management first rolled out, she was informed during a meeting between "message management leadership" and the preceptors that the department was staffed at only 40%.  (Tr. 114:13–21.)

198.    Despite Kaiser's promise that patients who placed a call would receive a response within four hours and that e-mails would receive a response in 24 business

hours, Harris testified that at times throughout 2019 and 2020 she was unable to return messages for five or six days after the patient's initial outreach due to the high volume of messages. (Tr. 118:7–23, 120:2–5, 122:19–123:1.)

199. As a team lead and preceptor, Harris also had access to department-wide data regarding message response times. This data showed message delays would, at times, "go out weeks . . . closer to ten days." (Tr. 123:8–124:7.)

200. Due to these delays, Harris testified she would often have to spend the first few minutes of a call with a patient engaged in "service recovery," which she defined as "having to apologize and listen and be mindful that this is [the patient's] experience, and it had not gone the way they thought it should have gone." (Id.)

201. This would in turn lengthen the amount of time she would spend on each call, further exacerbating the delay in responding to patient messages. (Id.)

202. Harris reported many concerns related to staffing and patient safety related to delayed message response times through Kaiser's online platform, SafetyConnect. A "Safety Connect" report is Kaiser's internal system for reporting safety issues. (Tr. 134:19–135:5.)

203. Harris estimated she filed between 20 and 40 SafetyConnect reports related to delay of care during her employment in Message Management from roughly 2019 to 2022. She never received substantive responses to the reports. (Tr. 136:8–11, 142:11–16.)

204. Harris also sent daily communications to her supervisors via e-mail and messenger to report on the number of messages left unanswered at the end of her shift. (Tr. 137:1–3; UPF&C ¶ 45; *see also, e.g.,* Ex. 88.)

205.    Although her SafetyConnect reports were ostensibly left unanswered, Harris explained that Kaiser tried "a lot of different things" to address the backlog of messages.  For instance, Message Management tried adjusting shift schedules to align with peak message hours.  (Tr. 144:14–20.)

206.    Kaiser also implemented "swarms," where a substantial portion of the Message Management team would collectively work on the in-basket of a medical office with a significant number of particularly old outstanding messages and "work it down" until all of the old messages received a response.  (Tr. 144:20–145:1.)

207.    Kaiser also offered RN, LPN, and MA staff across Kaiser Colorado the opportunity to sign up for "Saturday swarms" and work overtime hours to support high volume periods and provide more coverage to address patient messages.  (KPF&C ¶ 215; Tr. 145:1–10.)

208.    These Saturday hours were routinely a four-hour shift offered to volunteers from 8 a.m. to 12 p.m.  They were not mandatory, and no represented employee was required to work them.  (KPF&C ¶¶ 216–217; Tr. 145:21–23 (testifying "[t]he Saturdays were voluntary").)

209.    Harris estimated Kaiser conducted at least two Saturday swarms per month from 2019 to 2022.  (Tr. 145:11–13.)

210.    Many of the different shift times and swarms in Message Management occurred around the holidays, when Kaiser sees an increase in patients with colds and the flu, as well as during the COVID pandemic when Kaiser saw a significant increase in patient outreach and demand.  (Tr. 153:17–154:22, 156:3–12.)

211.    In the fall of 2019, Simmons transferred from the Rock Creek Primary Care clinic to the Message Management department, where she worked until she left Kaiser for another position at UC Health in 2022.  (Tr. 160:11–17, 183:3–7; UPF&C ¶ 53.)

212.    Simmons similarly testified that Kaiser expected phone calls "would be returned the same day" and e-mails would be responded to within 24 business hours. Despite this, "there were times when [message] volumes . . . were really high, [and] there were messages that remained in [her] in-basket for upwards of five days before [she] could get to them."  (Tr. 185:4–11, 185:20–186:2.)

213.    As time went on and the volume of messages increased, Simmons also testified that she and her colleagues began to send daily e-mail reports to management at the suggestion of the Union, including screenshots of remaining patient messages at the end of each day to document the backlog of unanswered patient messages.  (Tr. 196:7–20; *see also, e.g.,* Ex. 89.)

214.    Management, the RNs, the LPNs, the PAs, and the Nurse Practitioners ("NPs") in Message Management had daily meetings in the mornings called "daily huddles."  Simmons testified she would raise concerns about the message volumes, delays in responses, and the insufficient staffing to department management on a daily basis during those meetings.  (Tr. 202:11–21, 203:5–13.)

215.    In March 2020, Walker also bid into a position in the Message Management department.  She worked in Message Management until 2022 handling patient inquiries, providing consults to the nurse staff on complex medical decisions

outside the scope of their licensure, and overseeing COVID-19 therapeutic

prescriptions.  (Tr. 338:2–340:12; UPF&C ¶¶ 108, 123.)

216.   When COVID-19 therapeutics became available, the treatments needed to

be started within the first five days of infection to be effective, which "was fairly common

information" known to patients.  A significant amount of people were contacting Kaiser

to get them.  (Tr. 341:19–23, 355:4–10.)

217.   This meant that sometimes it took Kaiser until the fifth day to contact

someone.  It took about six weeks to two months for Kaiser to get caught up after the

rush of calls and messages from patients.  (Tr. 355:14-21.)

218.   Due to high call volume, Walker was almost never able to call patients

seeking these therapeutics until day five, rendering treatment ineffective or making the

patient ineligible for the resources available.  (Tr: 341:19–342:8.)

219.   At the peak of the crisis, during the roughly six-week timeframe, Walker

estimated that the five-day window to receive COIVD therapeutics elapsed for 20

patients per day without a response from Kaiser.  (Tr. 362:16–363:3.)

220.   When she did ultimately call these patients, Walker testified she "spent

easily the first 20 minutes of every phone call soothing very angry . . . hurt feelings."

Some threatened to report her to the Department of Regulatory Agencies ("DORA").

(Tr. 342:2–12.)

221.   Still, Kaiser did not pressure providers in Message Management to cut

calls short.  (Tr. 342:13–15, 359:9–19.)

222.   Walker estimated she, too, filed 12 SafetyConnect reports about the delay

in responding to messages regarding COVID-19 therapeutics but received no "active

response" from Kaiser and, to her knowledge, nothing was done to address the issue. (Tr. 342:23–343:19.)

223.    Walker acknowledged that, when the volume of messages in Message Management increased, there were opportunities to volunteer to work on Saturdays and to work overtime hours to help reduce the volume of outstanding messages.  In fact, Walker herself volunteered to work overtime on Saturdays.  (Tr. 357:25–358:18.)

224.    Moreover, during the COVID-19 pandemic, when the volume of incoming patient calls and e-mails was at an all-time high that far exceeded historical patient demand and there was an unprecedented amount of sick call outs from providers, Mills or his team would message the Primary Care providers and in-clinic staff with requests to assist with the Message Management pools.  (KPF&C ¶¶ 219–221.)

225.    In late 2020 and for much of 2021, Kaiser also hired agency RN staff to support Message Management when Kaiser's Medical Office Buildings reopened to in-person care.  These agency RNs were assigned to dedicated COVID message pools to support overall volume and response.  (KPF&C ¶¶ 223–224.)

226.    Kaiser increased the Message Management FTE for both RNs and LPN/MAs for the 2021 budget to address unknown volume trends following the initial COVID response.  The addition consisted of six RNs at 0.4 FTE (total 2.4 FTE) and four LPN/MAs at 0.4 FTE (total 1.6 FTE).  (KPF&C ¶¶ 225–226.)

    ii.    *Red Flagging Messages*

227.    Hand in hand with the overall concern as to delayed message response times was the fact that several nurses staffed in Message Management testified at trial as to their concerns with the department's "red flag" system for prioritizing urgent patient messages.

228.    As described above, the department established a prioritization system where urgent "red flag" messages were handled first.  These were messages that indicated emergent symptoms including but not limited to chest pain, shortness of breath, stroke, bleeding, acute pain, or sexual assault.  (Tr. 110:5–10, 17:20–118:1.)

229.    Harris testified that she "[o]ftentimes" realized that a patient whose message had not been red flagged had potentially urgent symptoms once she began assessing them.  (Tr. 112:9–12.)

230.    In her experience, patients sometimes downplay their symptoms and self-diagnose.  For instance, a patient may attribute chest pressure to reflux or indigestion, but chest pressure is also a symptom of a cardiac event, such as a heart attack.  (Tr. 112:12–21.)

231.    As a result, Harris surmised the Call Center Service Associate who fielded the patient's call or the LPN who screened that hypothetical patient's e-mail may not flag the message as urgent based on what the patient had self-reported.  (Tr. 112:22–113:4.)

232.    Simmons similarly testified that, in her experience, red flag symptoms were "overlooked at times."  She recalled one occasion where a patient reported shortness of breath in an e-mail to their provider, and the message was not red flagged by a Service Associate or LPN before it was forwarded to Harris's in-basket.  (Tr. 189:17–190:3, 191:11–15.)

233.    By the time Simmons got to that message in her chart, the message was three days old and the patient had presented to the emergency room with low oxygen saturations and been admitted to the intensive care unit.  (Tr. 190:3–14.)

234.    Still, Simmons elaborated that the failure in that case was attributable to a non-Union physician's alleged inaction—not an LPN or call center employee.  (Tr. 259:9–18.)

235.    Walker also testified that she saw errors with the red flag process "occasionally," including where messages were not red flagged even though they contained one of the words from the list that is supposed to trigger a red flag or, in the reverse, where messages were red flagged but did not contain one of those listed words.  (Tr. 344:6–12.)

236.    She specifically recalled a time that a patient reported chest pain and shortness of breath in a message that was not red flagged, so the patient did not receive a response for four days.  (Tr. 344:13–21.)

237.    On the other hand, Walker cited a recent example of a message that was red flagged for a possible broken toe, which is not an emergent symptom.  She explained that flagging non-urgent messages may result in poor utilization of resources because it necessitates that a nurse call that patient.  (Tr. 344:22–345:4.)

238.    Still, Walker acknowledged that there is always an opportunity for human error with flagging messages, no matter what level of provider is doing the flagging or conducting the initial message review.  (Tr. 352:12–23.)

239.    Inglis also testified about delays in receiving patient messages as a provider.  She cited one example where a patient sent a message about abdominal pain that Inglis did not receive for five days.  (Tr. 606:25–607:5.)

240.    Inglis testified the message should have been red flagged, but she ultimately did not know whether the failure to red flag the message was actually the reason for the delay.  (Tr. 607:6–20, 614:16–615:4.)

### iii.    *2022 Reorganization*

241.    In 2022, the decision was made to reorganize Message Management to address incoming patient calls with real time nurse advice, and to generally limit the department to responding to incoming patient e-mails.  (KPF&C ¶¶ 230–233.)

242.    Today, when a patient calls into Kaiser's general phone line with questions or to make an appointment, the call is answered by a Service Associate but all incoming patient calls asking for medical advice are routed to the NAL and addressed by RNs in real time.  (KPF&C ¶ 234.)

243.    To handle these NAL patient calls, Kaiser moved 66.4 RN FTE out of Message Management and placed (1) 30.4 FTE in the NAL to take incoming patient calls and (2) 36 FTE in dedicated Primary Care sites to support nurse clinic, scheduled visits, virtual patient care, and in-office providers.  (KPF&C ¶ 235.)

244.    Thus, since the reorganization and today, Message Management is staffed only with LPNs, MAs, and a small team of APPs.  (KPF&C ¶ 236; *see also* Tr. 348:1–6 (in August 2022, Kaiser "removed the registered nurses" from Message Management).)

245.    The LPNs and MAs screen e-mails to assess whether they can address the patient's issue, including questions about the status of lab results or setting up an appointment.  (KPF&C ¶ 237.)

246.    If the patient issue is outside the scope of the LPN's or MA's scope of practice, they can send the e-mail to a team of RNs who work at the patient's

physician's office or virtually consult with the Message Management APPs or the physician to answer the patient's question directly.  (KPF&C ¶ 238.)

247.    Walker testified that, after the 2022 reorganization, the nurses in the clinics see a template full of patients every day, respond to medical alert calls, and handle in-basket messages.  (Tr. 350:20–351:6.)

248.    She further testified that "the red flagging issue . . . still exists."  (Tr. 348:22–24.)

249.    On the other hand, Walker agreed the NAL has had an overall positive impact on Kaiser's response times to patient outreach and the LPN in-basket in Message Management has improved.  (Tr. 356:3-358:18.)

### iv.    *Negative Patient Outcomes and Licensure Risk*

250.    In general, Mills acknowledged that there was a risk to patients associated with delayed responses to messages.  (Tr. 1052:23–1053:8.)

251.    However, he testified that the Kaiser Quality/Risk department reviewed cases of quality or patient outcome concerns via the SafetyConnect system, and Mills is not aware of any SafetyConnect concerns that were deemed a serious or reportable adverse outcome due to Message Management response times or inadequate staffing. (KPF&C ¶¶ 227–228.)

252.    With regard to COVID-19 therapeutics, Walker could not recall any specific negative patient outcome as a result of Kaiser being unable to get back to them until the fifth day.  Moreover, she acknowledged there were a few options for patients to get COVID therapeutics in February and March 2021, and if patients could not get them through Kaiser, they had other options to get at least two of them.  (Tr. 354:5–25, 355:22–25.)

253.    Other than Kaiser nursing executives who were the subject of CBON complaints filed by the Union, Mills was also not aware of any provider in Message Management who was the subject of such a complaint or who lost their nursing license. (KPF&C ¶ 229.)

254.    Harris testified to a generalized concern for her license as a result of delayed responses to messages.  However, she was not aware of any specific complaints, threats, investigation, or discipline concerning her license while working for Kaiser.  (Tr. 149:12–150:21, 153:4–16.)

255.    Harris was also never disciplined for failing to meet Kaiser's metrics for responding to messages.  (Tr. 152:6–18.)

256.    Similarly, Simmons was not aware of any specific complaints, threats, investigation, or discipline concerning her license while working for Kaiser.  (Tr. 228:20–23, 260:6–261:9.)

257.    The patients who suggested to Walker that they would file a complaint against her with DORA never did.  (Tr. 352:24–353:8.)

### v.    Prior Staffing Concerns and/or Grievances

258.    In August 2019, Local 7 Business Representative Theresa Smith submitted a department-wide grievance on behalf of the Nurse Advice Line.  The grievance complained that "[t]he employer recognize [*sic*] their mutual and ethical responsibility to provide sufficient staffing to meet quality standards of patient care, workload and other issues affecting patient care, including but not limited to, assuring adequate coverage, sick replacement, overtime."  It requested that Kaiser "assure that no employee is required to work in any situation in which his or her license is threatened or places any employee or patient in danger. . . ."  The grievance cited the

Resolution/Grievance Procedure Article as applicable "Dispute Procedures" and indicated the "Contract Articles Violated" included the Patient Care Article but not the Staffing Article.  (Ex. A21; *see also* Tr. 786:12–788:2, 792:25–9 (Price testifying the grievance quoted the verbiage of the Patient Care Article), 839:7–17.)

259.    On the same date, Smith submitted a second grievance on behalf of the Nurse Advice Line, complaining that "[t]he Company is violating the CBA by not addressing workload distribution and replacement issues as quickly as possible."  As for the requested remedy, the grievance stated: "The Company shall provide adequate staffing within the budget to cover the work operations and other work related requirements by crating [*sic*] a planned replacement . . . ."  The grievance cited the Resolution/Grievance Procedure Article as applicable "Dispute Procedures" and indicated the "Contract Articles Violated" included the Patient Care Article and Workload Distribution Article but not the Staffing Article.  (Ex. A22.)

260.    In July 2020, Smith submitted two additional grievances related to staffing issues in Message Management:

a.    The first complained that "[t]he Company has not addressed workload and replacement issues as quickly as possible, as per the Collective Bargaining Agreement."  The grievance cited the Resolution/Grievance Procedure Article of the Multi-Professional CBAs as applicable "Dispute Procedures" and indicated the "Contract Articles Violated" included the Staffing Article, Patient Care Article, and Workload Distribution Article.  As for the requested remedy, the grievance stated: "The Company shall provide sufficient staffing to meet quality standards of workload assuring

adequate coverage and to assure that no employee is required to work in any situation where their license is threatened. . . ."  (Ex. A35; *see also* Tr. 793:10–25.)

b.    The second complained that "[t]he Company is violating the Collective Bargaining Agreement by not providing sufficient staffing to meet quality patient care and other related issues."  The grievance likewise cited the Resolution/Grievance Procedure Article of the Multi-Professional CBAs as applicable "Dispute Procedures" but indicated the "Contract Articles Violated" included the Patient Care Article but not the Staffing Article.  (Ex. A36.)

261.    There is no evidence of whether the grievances submitted by Smith ever proceeded to step two of the Resolution/Grievance Procedure or beyond.  (Tr. 836:19–837:9, 839:18–843:15.)

262.    Although not specifically highlighted by the parties at trial, the staffing committee logs also show that, in 2019 and 2020, the staffing committee was investigating at least five additional staffing concerns related to understaffing in Message Management and the Nurse Advice Line.  (Ex. 18 at 14–17.)

263.    Sometimes, but not always, these staffing concerns also expressly mentioned concerns about the quality or timeliness of patient care or patient safety. (*See, e.g.,* Ex. 18 at 14 (September 2020 staffing concern stating "THIS IS A PATIENT SAFETY ISSUE"); *id.* at 16 (October 2020 staffing concern describing instance where patient experiencing possible stroke waited an hour to speak to a nurse).)

264.    To the extent the staffing committee was unable to reach consensus on a resolution, there is no indication of whether the Union ever demanded arbitration as to any of these additional concerns.  (Ex. 18 at 14–17.)

F.    **Urgent Care Staffing**

265.    Urgent Care refers to Kaiser Colorado's three walk-in clinics that provide services for illnesses or injuries that might require immediate attention but are not life-threatening.  (KPF&C ¶ 101; Tr. 741:13–15.)

266.    Kaiser's Urgent Care clinics are not the same as hospital emergency rooms that operate 24/7 and are equipped to take care of the sickest patients who can be admitted directly and quickly to a hospital critical care setting.  However, unlike community urgent care that focuses on very low-acuity patients, Kaiser's Urgent Care clinics have advanced-imaging, stat-laboratory ability, which gives Kaiser more capacity to diagnose and is more cost effective for Kaiser's patient members.  (Tr. 740:9–22.)

267.    Thus, Kaiser's Urgent Care sees all types and ages of patients with a variety of concerns, from someone with a minor ailment like pink eye to high-acuity members who have a medical emergency.  (Tr. 740:23–741:5.)

268.    Mitchell became the leader of Urgent Care in 2020, at the height of the pandemic.  (KPF&C ¶ 100; Tr. 747:10–16.)

269.    During Mitchell's tenure at Kaiser Colorado, the Urgent Care clinics were staffed with a mix of emergency room clinicians, physicians, family practice physicians, APPs who provide or direct clinical care, and RNs and LPNs who provide nursing support.  (Tr. 741:16–23; KPF&C ¶ 102.)

270.    A physician's scope in Urgent Care would be to take care of the highest-acuity patients, although both the emergency room physicians and the family medicine physicians provide care to lower- and higher-acuity patients.  (Tr. 741:24–742:5.)

271.    APPs have different scopes of work and need a supervising physician to work at Kaiser.  APPs in Urgent Care provide care to lower-acuity patients in collaboration with the physicians.  (KPF&C ¶ 103; Tr. 742:5–9.)

272.    RNs are assigned to the higher-acuity patients, and LPNs are assigned to lower-acuity patients.  Kaiser's goal is to have its RNs and LPNs work at the top of scope of their employment and within their scope of practice per the SBON.  (Tr. 742:5-9–14.)

273.    Kaiser's Urgent Care providers see patients based on their acuity level on the emergency severity index ("ESI"); the sickest are prioritized and seen first.  Kaiser uses a numbering system that equates to a patient's acuity level assigned in triage: ES 1 is the very sickest patient and ES 5 is the least sick.  (Tr. 740:1–8, 741:6–12.)

274.    All Urgent Care nurses are trained in the ESI method; triage nurses cannot assign ESI numbers until they complete a specific training course and test to ensure they are competent to do the job.  (KPF&C ¶ 106; Tr. 743:19–744:3.)

275.    Utilizing the ESI method enabled Kaiser to develop a workflow method that was done in partnership with the Union.  Patients coming into Urgent Care are triaged by being asked about their chief complaint.  (KPF&C ¶¶ 108, 112.)

276.    ESI patients rated 4 or 5 and deemed lower acuity (for example, an ear ache) were treated by an APP and an LPN.  (KPF&C ¶¶ 109, 113.)

277.    That allowed Kaiser to allocate physicians and RNs for higher acuity patients.  (KPF&C ¶ 110.)

278.    When Mitchell became the Urgent Care leader in 2020, her first order of business was to create a staffing model to address the inefficiencies in the department

and the challenges of COVID, consistent with the goals of the Transformation.  (KPF&C ¶¶ 114–115.)

279.    Mitchell implemented a quality oversight program regarding delays in Kaiser's Urgent Care clinics in 2020 and 2021 that studied the length of stay of all patients by ESI rating, but looking first at the highest acuity patients.  (Tr. 744:20–745:3.)

280.    Kaiser set a goal of 120-minute length of stay for patients with an ESI 2 rating.  For every patient of ESI 2 who stayed longer than 120 minutes, Kaiser leaders conducted a manual review of the charts and then discussed them in Kaiser's monthly quality oversight committee meetings.  (Tr. 745:4–10.)

281.    The results helped Kaiser identify system issues and develop an Urgent Care staffing model that delineated how care for high-and low-acuity patients should be staffed because their care needs are very different; higher acuity patients need a higher level of staffing support.  (Tr. 745:11–746:8.)

282.    Mitchell developed a staffing model she implemented in early 2021 that was based on historical volumes and acuity levels to plan for patient volume surges.  (Tr. 747:14–25.)

283.    The 2021 staffing model created by Mitchell was for Local 7 members only.  The LPN staffing model for the Local 105 members (a different union) and the CPMG physician staffing model were created separately.  (Tr. 750:1–751:6.)

### i.    *Reduction in Part-Time Positions*

284.    The 2021 staffing model resulted in an increase of 9.0 FTE in Urgent Care, which was achieved by increasing part-time employee FTE to 1.0.  To provide

some flexibility, the staffing model permitted employees to work four, ten-hour shifts or five, eight-hour shifts per week.  (Tr. 748:13–25.)

285.    The increase to 1.0 FTE was also intended to address patient care quality issues.  Prior to the staffing change, a significant volume of Local 7 employees were part-time FTE—0.5 or 0.6 FTE—which resulted in multiple days where they were not at work.  This could equate to up to two weeks at times based on work schedules.  (Tr. 748:25-749:7.)

286.    These days off affected the employees' competency to work in Urgent Care with high-acuity patients, completing trainings, and communication.  Increasing employee FTE helped Kaiser maintain better training and competency.  (Tr. 749:2–10, 17–19.)

287.    In an Urgent Care setting, teams work closely together and get to know one another because there are high acuity patients on each shift.  Better patient care is given to sick patients when the teams are a cohesive unit.  (KPF&C ¶¶ 104–105.)

288.    Kaiser also saw significant differences in productivity when it increased the FTE of its employees.  For example, APPs in Urgent Care who are full-time see almost 20% more patients per day compared to part-time providers.  Mitchell testified this was attributable to providers being used to the fast-paced setting of Urgent Care. (Tr. 749:11–17.)

289.    The Union was not supportive of the move to full-time (40 hours per week) status.  The parties met weekly and on an entire Saturday to discuss the change.  (Tr. 755:9–20.)

290.    The Union requested three, 12-hour shifts (36 hours per week), but Kaiser did not implement those shifts because of the operational challenges of losing four productive work hours per week.  Mitchell worked with Heller, Sassaman and Bernstein to come up with options other than working four, ten-hour or five, eight-hour shifts, but she testified the Union was not willing to collaborate with Kaiser.  (Tr. 755:21–756:13.)

291.    Union leadership expressed concern to Mitchell that not allowing reduced FTE would impact the quality of life for nurses and other professionals and would increase turnover, thus exacerbating what the Union already perceived to be a staffing crisis.  (*See* KPF&C ¶ 122.)

### ii.    *Workload and Scope of Practice*

292.    Sassaman testified to her experience working in Urgent Care during the Transformation.  She testified that, between 2019 and the present, "[t]he level of acuity of the patients that we see, how sick they are, is greatly increased" and "[t]he volume of patients that we see has increased."  (UPF&C ¶ 25; Tr. 58:2–8.)

293.    Sassaman testified that the Transformation led to Kaiser keeping many acute patients in Urgent Care longer than it should have, including patients who went on to die at a hospital.  (Tr. 58:2–14, 59:16–60:1.)

294.    Sassaman often complained that the RNs were working outside of scope because they felt that Urgent Care was an emergency room.  (KPF&C ¶ 111.)

295.    Sassaman also testified that the volume of patients the Urgent Care clinics treated increased during the Transformation.  She attributed this to the fact that Urgent Care clinics were flooded with patients who had trouble getting timely appointments and attention from the Primary Care clinics, where Kaiser had cut staff significantly during the Transformation.  (Tr. 60:5–61:5.)

296.    In addition, Kaiser closed two Urgent Care clinics during the Transformation, including Westminster Urgent Care, "which was [Kaiser's] oldest urgent care and had a very high population of patients always."  This left only three Urgent Care clinics.  (Tr. 60:24–61:5.)

### iii.    *Negative Patient Outcomes and Licensure Risk*

297.    Although Sassaman stated that there were "bad [patient] outcomes" in Urgent Care and intimated that such outcomes later involved the deaths of patients after they had been transferred to hospitals, she did not provide any testimony showing a causal link between any alleged Kaiser staffing insufficiencies or policies and bad outcomes or deaths outside of Kaiser facilities.  (Tr. 57:11–16, 59:15–22.)

298.    She also acknowledged that, if a patient is not able to be seen at an Urgent Care clinic but has certain symptoms that require an emergency response, that patient can be referred to a hospital emergency department.  (Tr. 102:10–22.)

299.    Sassaman recalled a particular incident during which she was able to call 911 to have the patient transported to a hospital.  She did not have to receive approval from any supervisor before contacting 911 and there was no evidence she faced discipline for calling 911 or even that she feared that she would be disciplined for calling 911.  (Tr. 71:13–72:7, 102:19–22.)

300.    Mitchell testified that she has never asked any clinical staff in Urgent Care to work outside the scope of their license and is not aware of any manager working under her in Urgent Care asking a practitioner to work outside the scope of their license. (Tr. 742:15–21.)

301.    Sassaman could not otherwise provide any concrete examples of negative patient outcomes attributable to providers in Urgent Care working outside the scope of their license.  (Tr. 62:7–25.)

302.    Sassaman has never lost her nursing license.  (Tr. 95:9–13.)

### iv.    *Prior Staffing Concerns and/or Grievances*

303.    In November 2018, an RN in the Lakewood Urgent Care clinic submitted a staffing concern emphasizing the need to hire three more LPNs and one RN to fill recent or anticipated vacancies.  The staffing committee agreed to recruit for those open positions.  Although, Sassaman testified the additional positions did not solve the staffing shortage long-term because the added positions were removed during the Transformation soon thereafter.  (Ex. 45; Tr. 50:1–19; 66:15–67:15; UPF&C ¶ 27.)

304.    In August 2019, Leah Dowodzenka submitted a series of three grievances related to Urgent Care staffing:

a.    Dowodzenka submitted the first on behalf of the Lakewood Urgent Care clinic.  It complained that "[t]he Company has failed to provide sufficient staffing in Urgent Care to meet quality standards for patient care, workload and other issues affecting patient care including, but not limited to assuring adequate coverage, sick replacement, overtime and to assure no employee is required to work in any situation in which his or her license is threatened or places an employee or patient is in danger."  The grievance cited the Resolution/Grievance Procedure Article of the Multi-Professional CBAs as applicable "Dispute Procedures" and indicated the "Contract Articles Violated" included the Staffing Article, Patient Care Article, and Workload Distribution Article.  The grievance demanded that Kaiser "cease this practice, provide adequate staffing, comply with all Articles of the CBA . . . ."  (Ex. A25; *see also* Tr.

493:16–494:15 (Dowodzenka testifying she "borrowed" the language for the complaint from the Patient Care Article "because it's succinct and probably a little bit more eloquent than I would have been able to put it in my own words").)

b.      Dowodzenka submitted the second grievance on behalf of the Lakewood Urgent Care clinic, too.  It complained that "[t]he Company has created and maintained a working environment that fails to meet quality standards for patient care, and requires employees to work in a situation in which their license is threatened and places employees and patients in danger."  The grievance likewise cited the Resolution/Grievance Procedure Article of the Multi-Professional CBAs as applicable "Dispute Procedures" but indicated the "Contract Articles Violated" included the Patient Care Article but not the Staffing Article and Workload Distribution Procedure.  The grievance demanded that Kaiser "cease this practice, create and maintain a working environment that provides ethical, quality standards for patient care and protects health plan employees" and "comply with all Articles of the CBA . . . ."  (Ex. A26; *see also* Tr. 496:24–498:22 (Dowodzenka testifying Exhibit A26 "maybe . . . was withdrawn" and "may have been a duplication that . . . didn't progress").)

c.      Dowodzenka submitted the third grievance on behalf of the Lone Tree Urgent Care clinic.  It set forth an identical complaint and remedy as the first grievance submitted on behalf of the Lakewood Urgent Care clinic.  The grievance also cited the Resolution/Grievance Procedure Article of the Multi-Professional CBAs but indicated the "Contract Articles Violated" included the Staffing Article but not the Patient Care Article and Workload Distribution Article.  (Ex. A27; *see also* Tr. 499:8–500:9.)

305.    The August 2019 grievances proceeded to a step two meeting.  Ex. A28 (Kaiser's Step 2 response denying grievance).

306.    In November 2022, Smith submitted a grievance on behalf of the Centrepoint Urgent Care clinic.  It complained that Kaiser "failed to provide sufficient staffing in Urgent Care to meet quality standards for patient care, workload and other issues affecting patient care, including, but not limited to assuring adequate coverage, sick replacement, overtime and to assure no employee is required to work in any situation in which his or her license is threatened or places an employee or patient is in danger."  The grievance cited the Resolution/Grievance Procedure Article of the Multi-Professional CBAs as applicable "Dispute Procedures" and indicated the "Contract Articles Violated" included the Patient Care Article and Workload Distribution Article but not the Staffing Article.  It demanded that Kaiser "cease and desist this practice.  All scheduling and assignment of hours shall be done as per contract. . . ."  (Ex. A52.)

307.    Although not specifically highlighted by the parties at trial, the staffing committee logs also show that, in 2020 and 2021, the staffing committee was investigating at least four additional staffing concerns related to understaffing in Urgent Care.  (Ex. 18 at 38–39.)

308.    Sometimes, but not always, these staffing concerns also expressly mentioned concerns about the quality or timeliness of patient care or patient safety.  (*See, e.g.,* Ex. 18 at 39 (October 2021 staffing concern stating "expansion of fast track . . . is leading to patient safety issues").)

309.    To the extent the staffing committee was unable to reach consensus on a resolution, there is no indication of whether the Union ever demanded arbitration as to any of these additional concerns.  (Ex. 18 at 38–39.)

## G.    Pharmacy Services Staffing

310.    Dr. Kevin McGill worked as Area Manager in the Pharmacy service line until December 2019 when he became Regional Administrator of Pharmacy Operations, the position he holds today.  McGill testified that the Transformation also had a significant impact on Pharmacy Services.  (KPF&C ¶¶ 259, 261; Tr. 1188:5–10.)

311.    Kaiser's Colorado mail order operations were transferred to Kaiser's Southern California mail order facility.  This resulted in the loss of approximately 50 Local 7 pharmacist positions.  (KPF&C ¶¶ 262–263.)

312.    In addition, 24 pharmacy management positions were eliminated in outpatient pharmacies.  (KPF&C ¶ 264; Tr. 1194:3-8.)

313.    To compensate, Kaiser increased the number of pharmacy technicians in some, but not all, pharmacy locations.  (Tr. 1194:10-15, 20-25.)

314.    Pharmacy technicians cannot perform all tasks of a pharmacist, including medication verification, patient consultation, and resolving drug interactions.  (Tr. 1204:1–1205:10.)

315.    At the same time, Kaiser created 31 new pharmacist positions called Pharmacists-in-Charge ("PICs"), who work at the outpatient pharmacies.  The PICs took on many of the supervisory responsibilities that management had previously had, including staff scheduling, service quality, and State Board of Pharmacy compliance. They are paid approximately $5.00 more per hour than regular pharmacists.  (KPF&C ¶¶ 265–266; Tr. 1209:6–12.)

316.    Although staff numbers decreased, the Transformation also resulted in increased productivity expectations; pharmacists were asked to fill more prescriptions per day.  (KPF&C ¶ 267.)

317.    Pre-Transformation, the productivity expectation for Kaiser pharmacists was 15 tasks per hour.  Post-Transformation, the expectation increased from 18 to 18.5 tasks per hour.  (Tr. 1168:22–1169:4.)

318.    Under the current staffing model, each Kaiser pharmacy has core staff that are assigned to each location.  The majority of Kaiser pharmacies are staffed with two pharmacists that cover operating hours and between approximately four and eight pharmacy technicians,6 on average.  (KPF&C ¶¶ 271–272.)

319.    The State Board of Pharmacy requires pharmacies in Colorado to have a minimum ratio of one pharmacist for every six pharmacy technicians.  However, Kaiser uses one pharmacist for every two technicians because pharmacists must verify all prescriptions measured and filled by the pharmacy technicians.  (KPF&C ¶¶ 284–286.)

320.    Patient membership has decreased over the last five years since the Transformation, but other than one layoff when some pharmacists chose to take severance and leave the company, and others who chose to join the float pool, Kaiser has reduced staff through attrition—i.e., by not replacing pharmacists who voluntarily leave Kaiser.  (KPF&C ¶ 288.)

321.    Many pharmacists were angry or unhappy with the operational changes during the Transformation, especially those who were asked to work at a different

---

6 The pharmacy technicians are represented by the SEIU Local 105 Union.  (KPF&C ¶ 273.)

location or move to the float pool.  This caused a lot of tension between the pharmacists and management.  (KPF&C ¶¶ 268–269.)

### i.    *Increased Workloads*

322.    Two Kaiser pharmacists testified at trial regarding the impact of the staffing cuts and increased productivity expectations in Pharmacy Services during and after the Transformation.

323.    Dr. Ryan Priest is a PIC at Kaiser's Premier Pharmacy and has held this position for three years.  He holds a Doctorate of Pharmacy ("PharmD") and has been a licensed pharmacist since 2011.  He has worked for Kaiser for nine years, initially in California before transferring to Colorado Springs.  Priest is also a steward for Local 7 and has held this position for approximately two years.  (Tr. 404:3–21; UPF&C ¶¶ 174–175.)

324.    Priest testified that when he first began working at the Premier Pharmacy, it was staffed with two full-time pharmacists and two full-time pharmacy technicians.  (Tr. 407:17–23.)

325.    In April 2023, the Premier Pharmacy was impacted by staffing cuts, and it was reduced to just one pharmacist.  (Tr. 407:24–408:10; UPF&C ¶ 181.)

326.    The reduction in personnel also coincided with a change in his pharmacy's hours, shortening operating times from 7:30 AM to 6:30 PM to 9:00 AM to 5:30 PM.  (Tr. 408:2–408:5.)

327.    As a result, Priest testified that "all of the remaining work was just now for one pharmacist in a condensed time period."  (Tr. 408:6–10.)

328.    Priest explained that, "on the best day," Kaiser schedules four pharmacy technicians to work alongside the PIC.  However, frequent callouts and staffing

shortages mean that Priest often works alone or with only one or two pharmacy technicians.  (Tr. 406:23–407:5.)

329.    Priest estimated that when a pharmacy technician is absent, there is only a 20 to 30% chance that a replacement will be provided from the float pool.  (Tr. 411:2–8.)

330.    Priest testified that on occasions he has been absent, he has "always seen [his] shift replaced."  However, it has always been by a staff pharmacist who cannot handle his PIC duties.  Thus, he is "backlogged" on extra compliance work in proportion to the number of days he was absent.  (Tr. 411:6–18.)

331.    If Kaiser were unable to backfill Priest's absence on any occasion, the pharmacy's "doors would not open."  (Tr. 411:19–22.)

332.    As the sole pharmacist on duty, Priest is responsible for supervising pharmacy technicians while also fulfilling his own professional responsibilities.  He noted that supervision levels vary depending on pharmacy technician experience.  An experienced, trained pharmacy technician requires less oversight, while a new technician or a floating (temporary) technician may need constant supervision.  Under normal conditions, he estimated that he need about 50% of his time to supervise.  (Tr. 409:22–410:11.)

333.    Priest also explained that, post-Transformation, Kaiser enforces strict Total Member Experience ("TME") performance metrics, which require that prescriptions be completed within 15 minutes of a patient checking in.  The clock starts when the patient presents their insurance card and the time it takes to complete each step of the

fulfillment process is recorded through Kaiser's biometric fingerprint system, which tracks every step of the prescription process. (Tr. 412:12–413:7.)

334. Priest testified that failure to meet performance metrics results in your pharmacy being marked as "red" (below target) in weekly check-in calls between management and the PICs. (Tr. 414:6–12.)

335. Priest stated that individual pharmacists who fail to meet timing metrics also face potential disciplinary action. He testified he has "been told to contact a union representative to have disciplinary conversations about metrics." (Tr. 413:8–414:5.)

336. From Priest's perspective, pressure to adhere to the 15-minute rule has contributed to medication errors, including wrong pills in a bottle, incorrect dosages, and medications being sold to the wrong patient. (Tr. 421:9–21.)

337. Priest warned that working under time pressure and with inadequate staffing significantly increases error rates, which directly affects patient safety. He stated that pharmacists who work too quickly are more prone to mistakes, and if an error occurs, the pharmacist's license is at risk. (Tr. 424:17–426:8.)

338. Kaiser also uses a "fill-on-demand" system, meaning a doctor electronically sends a prescription to Kaiser, the pharmacy does not prepare the prescription in advance, and the patient must actively request their prescription by calling, visiting the pharmacy, or using an online system. (Tr. 406:3–8.)

339. Priest noted that this system is fundamentally different from industry standards, where prescriptions are often "filled ahead" to reduce patient wait times. (Tr. 405:24–406:2.)

340.    Priest testified the fill-on-demand model is susceptible to delays, especially when patients are unaware that they need to initiate their prescription order. Priest described a common scenario where a doctor prescribes an urgent medication (*e.g.*, an antibiotic) and the patient assumes the pharmacy will automatically fill it.  (Tr. 427:13–23.)

341.    If the pharmacy is overwhelmed with long lines, calls go unanswered due to understaffing, causing further delays.  Moreover, if the medication is out of stock or ordered too late in the day, delivery can be delayed by several days.  (Id.)

342.    Thus, what should be a simple prescription pickup could take several days, potentially worsening a patient's medical condition.  (Id.)

343.    Priest testified that a Kaiser manager told him he should stop speaking up about patient safety issues because it would put a "target on [his] back."  He expressed concerns that his trial testimony posed a risk to his career, but he felt obligated to speak up for patient safety.  (Tr. 433:3–434:3.)

344.    Dr. Jin Pae is a licensed pharmacist who has worked at Kaiser Permanente since 2007.  She earned her PharmD from the University Health Science Center in 2004 and has held her pharmacist license since that time.  Pae has also served as a Union steward since late 2019.  (Tr. 442:7–23, 443:18–21; UPF&C ¶ 200.)

345.    Over the course of her career at Kaiser Permanente, Pae has worked at multiple locations but has been at the Westminster Pharmacy since 2010.  (Tr. 443:10–17; UPF&C ¶ 201.)

346.    Pae testified that Westminster Pharmacy has experienced a severe reduction in staffing levels over the years, significantly impacting patient care and

pharmacist workloads.  In 2010, the Westminster pharmacy had nine pharmacists working weekdays (three opening, three mid-shift, and three closing).  Following Kaiser's Transformation initiative in 2019, staffing was reduced to seven pharmacists. (Tr. 446:4–11.)

347.    Between 2020 and 2022, additional layoffs and an unfilled retirement position brought the number down to 4.5 pharmacists.  (Tr. 446:12–447:8.)

348.    Pae testified that the reductions in staff also impacted the pharmacy technicians.  In 2010, the pharmacy employed 21 technicians.  After the Transformation in 2019, technician numbers dropped to between 14 and 16.  Currently, her pharmacy only has between 10 and 12 technicians, with some shifts operating with as few as eight technicians.  (UPF&C ¶ 208; Tr. 447:9–23.)

349.    Before the Transformation, the volume of prescriptions at the Westminster Pharmacy decreased because Kaiser moved the mail order pharmacy and the prescription automated refill center ("PARC") from Colorado to California.  (Tr. 447:24-448:11.)

350.    However, while the number of prescriptions to fill at the Westminster Pharmacy per week has gone down, the number of prescriptions processed per pharmacist has steadily increased.  Before 2019, pharmacists at Westminster processed approximately 17 prescriptions per hour per FTE.  After staffing reductions, that number increased to 22 to 23 prescriptions per hour per pharmacist. (Tr. 448:12–449:4.)

351.    Pae similarly testified regarding Kaiser's enforcement of the 15-minute TME rule, which requires that 70% of prescriptions be filled within 15 minutes of patient check-in.  (Tr. 449:5–450:6.)

352.    Pharmacists are tracked through a dashboard system, which ranks locations and individuals based on their prescription completion speed.  Individual pharmacists who fail to meet the TME benchmark can be subject to disciplinary action, known as joint objective discovery ("JOD").  (Tr. 455:19–458:20.)

353.    Crucially, there is no pause button on the 15-minute timer, meaning that pharmacists are still required to meet this deadline even in situations where they must contact a doctor to correct a dose or resolve an insurance issue or encounter a dangerous drug interaction that requires investigation.  (Tr. 454:22–455:8.)

354.    Pae testified that the pressure to meet the TME goal and understaffing forces pharmacists to rush verification steps, which directly contributes to increased medication errors.  Pae provided an example where, in 2022, a pharmacist misfilled oxycodone at 10 times the prescribed dose, which caused a patient to experience a respiratory issue and require hospitalization. (Tr. 463:16–464:1.)

355.    Pharmacists have also missed critical drug interactions, sometimes only catching them at the patient consultation stage.  (Tr. 464:2–20.)

356.    Pae testified that Kaiser supervisors instructed pharmacists to prioritize speed over accuracy, telling them to address prescription problems later and move the queue along.  (Tr. 463:10–15, 465:3–6.)

357.    When she personally raised concerns about the risks of rushing prescription verification, she was told she did not have to double-check prescriptions

apart from confirming it was the right drug, which potentially contributed to undetected errors.  (Tr. 470:4–25.)

358.    Pae described multiple instances where she raised concerns about staffing shortages, patient safety risks, and pharmacist licensure issues during weekly meetings.  (Tr. 466:6–21.)

### ii.    *Negative Patient Outcomes and Licensure Risk*

359.    In Pharmacy, quality events are prescription mistakes that impact patients. McGill testified that he reviewed each quality event in Pharmacy since 2019.  (KPF&C ¶¶ 292–293.)

360.    McGill stated that between 2019 and 2024, only 34 quality events (serious medication errors reaching patients) were reported across 28 outpatient pharmacies. (Tr. 1215:10–15.)

361.    Errors were primarily identified through patient complaints or provider follow-ups.  Accordingly, He acknowledged that the reported numbers might underrepresent actual errors, as some may go undetected.  (Tr. 1216:5–25.)

362.    McGill also did not conduct an independent review of the pharmacy's medical error records ("MERs").  (Tr. 1218:6–12.)

363.    McGill is nonetheless unaware of any Board of Pharmacy or patient complaints submitted against a pharmacist during this same time period.  (KPF&C ¶ 294.)

364.    Priest testified that if he is pressured to work faster than he feels is safe, then the chances of making an error increase, but he did not testify that he actually committed more errors.  (Tr. 424:17–23.)

365.    Pae testified about a pharmacist who mis-filled oxycodone in 2022, but she did not testify as to whether the prescription error was a result of insufficient staffing or whether this person's pharmacy license was impacted by the prescription error.  (Tr. 463:23–25.)

366.    Pae testified that a pharmacist missed critical drug interactions that were found at the patient consult station, but she did not link those missed drug interactions to insufficient staffing or feeling pressure to work faster.  She did note, however, that missing critical drug interactions "doesn't happen all the time."  (Tr. 464:14–20.)

367.    Priest's pharmacy license has not been suspended or revoked, and he is not aware of any complaint made against his pharmacy license.  (Tr. 440:23-441:7.)

368.    Similarly, Pae testified that a prescription error can have a detrimental effect on a pharmacist's license but provided no testimony that any pharmacist's license was affected due to insufficient staffing.  (Tr. 463:16–25.)

369.    Pae's pharmacy license has not been suspended or revoked, she is not aware of any complaint made against her pharmacy license, and she has not received a letter of admonition from the State Board of Pharmacy.  (Tr. 472:14–22.)

### iii.    Prior Staffing Concerns and/or Grievances

370.    In May 2019, Dowodzenka submitted a grievance on behalf of "All Affected Regional Pharmacy," complaining that "[t]he Company has failed to identify any acceptable solutions for workload distribution, staffing, and backfill, as outlined in the collective bargaining agreement."  The grievance requested that Kaiser "provide adequate staffing, backfill, and workload distribution" and "grant backfill for CE, tuition reimbursement, and paid time off as outlined in the CBA. . . ."  The grievance cited the Resolution/Grievance Procedure Article of the Multi-Professional CBAs as applicable

"Dispute Procedures" and indicated the "Contract Articles Violated" included the Staffing

Article and Workload Distribution Article but not the Patient Care Article.  (Ex. A19.)

371.    In April 2021, Dowodzenka submitted a grievance related the Highlands

Ranch Pharmacy, complaining that "[t]he Company is implementing a staffing model

that puts the patients and Pharmacist's license at risk."  The grievance demanded that

Kaiser "cease this practice and provide enough staff to meet their obligations and an

ethical responsibility to provide sufficient staffing to meet quality standards of patient

care, workload, and other issues affecting patient care."  The grievance cited the

Resolution/Grievance Procedure Article of the Multi-Professional CBAs as applicable

"Dispute Procedures" but did not cite either the Staffing Article or the Patient Care

Article as "Contract Articles Violated."  (Ex. A41.)

372.    On the same date, Dowodzenka submitted an identical grievance on

behalf of the Castle Rock Pharmacy.  (Ex. A42.)

373.    Although not specifically highlighted by the parties at trial, the staffing

committee logs also show that, between 2019 and 2023, the staffing committee was

investigating at least 23 staffing concerns related to understaffing in Pharmacy

Services.  (Ex. 18 at 23–29; Ex. 19 at 8–10; *see also, e.g.,* Ex. 16 (December 2022

staffing concern submission regarding the lack of "tech help" and recommending that

management "Fire Chad and get someone who understands pharmacy and the needs

to take care of patients correctly").)

374.    Sometimes, but not always, these staffing concerns also expressly

mentioned concerns about the quality or timeliness of patient care or patient safety.

(*See, e.g.,* Ex. 18 at 24 (October 2022 staffing concern stating that short staffing in Lone

Tree Oncology Pharmacy "is leading to delays in patient care and patients walking out without treatment"); *id.* at 28 (July 2021 staffing concern stating that Union member fears reduction in tech staffing at Castle Rock Pharmacy will "lead to member loss, poor satisfaction and increase risk of medication errors").)

375.    To the extent the staffing committee was unable to reach consensus on a resolution, there is no indication of whether the Union ever demanded arbitration as to any of these additional concerns.  (*See* Ex. 18 at 23–29; Ex. 19 at 8–10.)

### H.    Behavioral Health Services Staffing

376.    Dr. Laura Patke currently holds the title of Executive Director of Behavioral Health.  Patke has a doctorate in Psychology and has worked in the behavioral health field for 26 years.  She started working for Kaiser in 2010 and has held positions in the Behavioral Health department as Senior Manager, Director, Regional Area Administrator, and Senior Operations Director.  (KPF&C ¶ 246.)

377.    As Executive Director between 2018 and 2022, Patke made staffing decisions for Kaiser's Behavioral Health department during the Transformation, excepting that any decisions regarding FTE required final approval from higher management.  (Tr. 1106:17–1107:2.)

378.    Generally, Behavioral Health staffing is guided by patient demand, Colorado Division of Insurance ("CDI") regulations concerning patient access, and Kaiser's hiring challenges.  (KPF&C ¶ 249.)

379.    In 2018, the CDI promulgated regulations governing patient access to mental health services standards that requires health plans provide follow-up non-emergency behavioral health, mental health, and substance use disorder care appointments within seven calendar days.  (3 CCR 7024-4, § 6; KPF&C ¶ 250.)

380.    To ensure legal compliance and provide the necessary access to patients, Kaiser has contracts with external behavioral health partners to provide overflow patient care, including with partners that provide after-hours services such as inpatient beds and walk-in crisis centers across the Denver Metro area.  (KPF&C ¶ 251.)

381.    Importantly, to provide health insurance plans in Colorado, Kaiser must also comply with state regulations regarding "network adequacy" for mental health providers.  "Network adequacy" means that Kaiser must prove that it has enough providers to support the mental health services needs of its patient members.  Kaiser's demonstration of "network adequacy" is a regulatory indication that it is adequately covering its patients.  (KPF&C ¶¶ 252–254.)

382.    Kaiser, the nation, and the world have seen unprecedented increases in the demand for mental health services that healthcare entities cannot keep up with.  In particular, patient demands for behavioral health treatment significantly rose during and following COVID.  (*See* KPF&C ¶ 255; Tr. 268:16–23.)

383.    Kaiser has not increased FTE in behavioral health since 2021, despite continued growing demand.  Moreover, Kaiser's behavioral health budget remained flat or decreased in multiple years, including in 2019, 2022, 2023, and 2024.  (Tr. 1129:6–18; UPF&C ¶ 84.)

384.    Since 2018, Kaiser has steadily increased referrals to external contracted therapists.  (Tr. 1109:5–8.)

385.    Kaiser does not always directly refer patients to specific outside providers and instead sometimes provides patients with contact information for external providers for patients to contact on their own.  (Tr. 1109:9–23.)

386.    Some patients have struggled to get appointments with outside providers, but Patke was not directly aware of this being a widespread issue.  (Tr. 1109:24–1110:5.)

387.    Since outside providers are not part of Kaiser's integrated care system, outside providers have access to limited information in a patient's chart and notes, and internal Kaiser therapists do not have access to outside provider notes.  (Tr. 1110:23–1111:13.)

388.    Patke testified that, between 2018 and 2022, patient return access time for internal Kaiser providers was approximately three weeks for the majority of providers, but up to six weeks for others.  (Tr. 1113:16–1114:24.)

### i.    Inability to Meet Rising Demand

389.    Two Kaiser Behavioral Health providers testified at trial as to their concerns that providers were unable to meet rising patient demand internally and, as a result, increased reliance on external providers.

390.    Brenner has worked in the Behavioral Health outpatient department as a licensed marriage and family therapist for 25 years.  (Tr. 265:18–266:3, 14–20.)

391.    Brenner testified that before 2019 (pre-Transformation), the majority of patients were treated internally by Kaiser-employed therapists.  Patients were only referred to external providers for specialized care that Kaiser did not offer, such as severe obsessive-compulsive disorder treatment.  (Tr. 267:13–23.)

392.    In 2019, Brenner recalled that Kaiser began to significantly increase referrals to external providers.  (Tr. 267:24–268:6.)

393.    Brenner testified that, although patient demand has increased "remarkably" since COVID, Kaiser has not increased staffing in proportion.  (Tr. 268:16–269:12.)

394.    Brenner testified regarding significant concerns with respect to quality of care due to the use of external providers.  One of these concerns was the lack of integration.  These external providers were not part of Kaiser's integrated healthcare system, meaning they did not share medical records with Kaiser therapists, they did not regularly communicate with Kaiser-employed therapists, psychiatrists, or healthcare teams.  (Tr. 270:9–22.)

395.    Further, Brenner testified regarding the lack of oversight of these external providers.  No measures are used to assess the effectiveness or quality of external providers.  (Tr. 270:23–271:3.)

396.    Brenner's patients who received treatment from external providers over the years reported dissatisfaction with scheduling, identifying a provider appropriate for their specific needs, and unprofessional behavior.  (Tr. 273:1–274:4.)

397.    As a result of these negative experiences, Brenner testified patients expressed frustration and anger toward both Kaiser and the external providers.  In some cases, their negative experiences consumed much of their therapy sessions, which made treatment less effective.  (Tr. 274:4–14.)

398.    Brenner also testified that, between 2019 and 2024, a full-time internal Kaiser therapist was expected to handle eight new patient intakes per week.  As a result, internal providers had limited availability for return patient visits which created unacceptably long patient wait times.  (Tr. 277:24–280:1.)

399.    Brenner described the emotional toll of telling patients they had to wait four to six weeks for a follow-up, despite needing weekly or biweekly care.  (Tr. 279:7–14.)

400.    There were also delays in the Intensive Outpatient Program ("IOP"), which was designed for patients with severe symptoms who required more frequent therapy (between three and nine hours per week).  In 2019 and 2020, the IOP team was significantly understaffed, at one time shrinking to only two therapists (from the typical three or four), which lead to long waitlists for critical mental health services.  (Tr. 280:2–281:2.)

401.    As a result, Brenner testified that patients in crisis were unable to access timely treatment, which increased their risk of hospitalization or worsening mental health conditions.  (Tr. 284:4–286:19.)

402.    Brenner and other Union representatives raised concerns about staffing shortages and its impact on patient care and safety to Kaiser management.  In May 2021, Brenner co-authored a "Letter of Extreme Concern", outlining the patient access crisis.  (Tr. 286:20–287:8; Ex. 82.)

403.    Brenner testified that Kaiser failed to provide a substantive response to the letter.  (Tr. 291:3–14.)

404.    In August 2024, however, Kaiser restructured the Behavioral Health department to prioritize one-to-two-week follow-up access for patients.  Nevertheless, Brenner testified the reorganization has not solved patient access problems because the number of internal outpatient therapists has decreased by 15 to 20%, so more patients are being sent to a provider in Kaiser's external network.  (Tr. 291:19–292:17.)

405.    Thus, while the reorganization improved follow-up access, from Brenner's perspective it did not solve the larger issues of inadequate staffing and over-reliance on external providers.  (*Id*.)

406.    Dr. Holly Kennedy-Hansen is a Doctor of Clinical Psychology and has a graduate certificate in project management and certificates in integrated care psychology and change management.  She joined Kaiser Permanente in 2017 as an Integrated Care Psychologist.  (Tr. 364:3–13, 364:25–365:16; UPF&C ¶¶ 141–143, 145.)

407.    Kennedy-Hansen's work history before Kaiser included working as a contracted psychologist for the United States Air Force for four to five years.  (Tr. 364:14–365:7; UPF&C ¶ 144.)

408.    Kennedy-Hansen became a Union steward approximately six months after joining Kaiser.  In 2023, she took on a special assignment as the Alliance Partnership Representative, a position under the labor-management partnership, focused on process improvement initiatives within Kaiser's behavioral health system.  She is not currently seeing patients.  (Tr. 365:12–367:16; UPF&C ¶¶ 146, 147.)

409.    From 2017 to mid-2023, Kennedy-Hansen worked as a Behavioral Medicine Specialist ("BMS") at Kaiser's Smoky Hill Clinic.  (Tr. 367:24–370:13; UPF&C ¶ 148.)

410.    BMS providers are psychologists or social workers embedded in primary care settings.  60% of their time is spent in real-time patient consultations alongside primary care physicians and 40% of their time is used for follow-ups, typically one to four visits per patient, lasting 15 to 30 minutes each.  (Tr. 368:2–20; UPF&C ¶ 153.)

411.    Unlike outpatient therapists, who provide traditional therapy sessions lasting 50 minutes, BMS providers do not maintain a caseload and focus on brief interventions.  (Tr. 368:24–369:18.)

412.    When Kennedy-Hansen started at Smoky Hill in 2017, there were two BMS providers.  Around 2022, one left and was never replaced, leaving Kennedy-Hansen as the only provider.  (Tr. 370:14–24.)

413.    Initially, patients could not schedule an appointment with a BMS provider directly; they were only accessible through a referral from a primary care doctor.  In 2018 or 2019, Kaiser introduced BMS telephone visits, allowing some patients to call in for a 15-minute consultation so a member of the BMS could determine which patients should be referred to a higher level of care, such as outpatient therapy.  (Tr. 375:23–376:22.)

414.    Under the new telephone system, patients first called non-clinical schedulers, who followed a scripted decision tree to determine whether to direct patients to BMS, outpatient therapy, or another specialty area.  In other words, non-clinical staff made triage decisions.  (Tr. 378:19–379:3.)

415.    Kennedy-Hansen testified that many patients at new complained that they were misdirected to BMS when they were seeking outpatient therapy.  (Tr. 380:17–381:13.)

416.    Still, patients were able to get an initial phone consultation with BMS fairly quickly through the telephone system—either same day or within two to three days.  Follow-up appointments with BMS were also scheduled fairly quickly.  (Tr. 382:8–21.)

417.    However, patients who needed outpatient therapy sometimes could not get an appointment until one or two months out, depending on the provider.  (Tr. 382:20–383:3; UPF&C ¶ 162.)

418.    If patients were referred to contracted external providers, they were given a list and it was up to the patient to schedule an appointment.  "[A] lot of patients" later reported they called multiple providers and were unable to connect to care.  (Tr. 385:1–386:17.)

419.    Kennedy-Hansen also testified that Kaiser does not have quality metrics built into contracts with external providers, which is "a major concern," and internal providers also have no way of seeing the notes or documentation from external providers, which creates a "disconnect."  (Tr. 392:1–20.)

### ii.    *Negative Patient Outcomes and Licensure Risk*

420.    Despite these challenges, Patke is generally unaware of any SafetyConnects or negative patient outcomes in Behavioral Health arising out of insufficient staffing or staffing issues.  (KPF&C ¶ 256.)

421.    Patke is also not aware of any Local 7 Behavioral Health employees who have been the subject of a State Board of Psychologists or State Board of Professional Counselor Examiners complaint, or who have lost their professional licenses because of insufficient staffing or staffing issues in the department.  (KPF&C ¶ 257.)

422.    Brenner testified that for years, he did not fully recognize the risk to his professional license caused by Kaiser's system failures.  However, he now believes that the unsafe staffing levels and patient care delays placed his license at risk.  (Tr. 296:15–297:8.)

423.    Nevertheless, Brenner's professional license has never been suspended or revoked, he is not aware of whether his license has ever been subject to investigation by a patient or another provider, and he has never sought official guidance from DORA to determine whether his licensure is at risk as a result of the concerns he has raised about patient access at Kaiser.  (Tr. 318:13–24.)

424.    Kennedy-Hansen similarly testified that she was concerned about the ethical and legal implications of Kaiser's system.  The American Psychological Association ("APA") and DORA require providers to ensure continuity of care.  And she worried that forcing patients to wait weeks or months for a referral out to a higher scope of care violated ethical standards.  (Tr. 393:20–394:25; UPF&C 171.)

425.    Still, Kennedy-Hansen's professional license has never been suspended or revoked either, she is not aware of any complaints or investigations related to her license, and she has never sought an opinion from anyone at DORA regarding her personal licensure concerns.  (Tr. 400:20–401:16.)

### iii.    *Prior Staffing Concerns and/or Grievances*

426.    Brenner has been involved in grievances submitted pursuant to the Local CBAs' Patient Care and Staffing Articles.  At least one of those grievances went to arbitration, and Brenner testified at the proceedings.  (Tr. 310:8-19; Exs. A14, A20.)

427.    Exhibit A14 contains two 2011 grievances filed by Brenner.  (Tr. 311:23-312:2, 313:5-313:24; Ex. A14.)

428.    The first grievance in Exhibit A14 references the Patient Care Article and alleges that Kaiser was not staffing outpatient clinics with an adequate number of therapists to provide safe and appropriate care.  (Tr. 314:11-20; Ex. A14.)

429.    Brenner testified in the arbitration of this grievance in 2015, and Patke recalled that it involved the 2011 grievance.  (Tr. 314:21–22, 1088:12–1092:4, 1127:1–6.)

430.    The outcome of the staffing arbitration in which Brenner recalls testifying resulted in the arbitrator determining that Kaiser needed to do two things: increase staffing FTE by ten or eleven FTE and allow providers greater control over their schedules.  The arbitrator recommended increasing behavioral health FTE by 10, despite a four-year delay between filing and resolution. (Tr. 314:23–315:9, 1127:7–14.)

431.    The second grievance in Exhibit A14 alleges Kaiser is subcontracting therapists' work in violation of the CBA, which has to do with Kaiser using external providers.  (Tr. 315:15–23; Ex. A14.)

432.    Exhibit 121 is a Settlement Agreement between the Union and Kaiser concerning resolution of a subcontracting issue where Kaiser agreed to make a monetary payment to the Union.  (*See* Tr. 315:24–316:4; Ex. 121.)

433.    The Union has also raised concerns related to alleged inadequate staffing in the mental health department through the regional staffing committee.  Exhibit 35 is dated November 2020 and arises out of the Staffing Committee created under Article 24 of the Mental Health CBAs.  (Tr. 304:20–305:2; Ex. 35.)

434.    Exhibit 35 is an example of a staffing concern for Kaiser's Mental Health Intensive Outpatient program and Chemical Dependency Intensive Outpatient program. (Tr. 281:3–16; Ex. 35 ("Mental Health Intensive Outpatient Program and Chemical Dependency Intensive Outpatient Program is understaffed.").)

435.    Brenner is not aware of whether the staffing concern at issue in Exhibit 35 was taken to arbitration.  (Tr. 305:3–7.)

436.    Exhibit 20 is a November 2021 staffing committee escalation form regarding a staffing concern Brenner raised about the lack of adequate therapist FTE (*i.e.*, staffing) to meet patient demand.  (Tr. 302:6–25; Ex. 20; *see also* Ex. A64 (different version of escalation form, noting date of initial staffing concern was November 2020).)

437.    Brenner is also not aware of whether the Union escalated this staffing concern to arbitration.  (Tr. 303:1–22.)

438.    Exhibit 99 is an e-mail outlining Kennedy-Hansen's concerns about BMS, concerns that were often addressed in the Mental Health Services Committee.  (Tr. 374:4–375:13.)

439.    In 2021, therapists reported an "immediate crisis" in patient access, negatively affecting care quality.  Exhibit 82 is an e-mail from Local 7 mental health stewards (May 18, 2021) raising these concerns and referencing an article about Kaiser's broken mental healthcare system. (Tr. 1114:14–18, 1115:1–10; Ex. 82.

440.    The Union proposed a plan for Kaiser to meet and address the issue, but there were delays in management responding.  Kaiser eventually scheduled a meeting on July 7, 2021, nearly two months later, and only after follow-ups from the Union.  (Tr. 1115:11–25, 1117:1–8.)

441.    Still, neither Brenner, nor any other witness testified or provided evidence that Kaiser prohibited or limited the Union from initiating arbitration proceedings.

442.    To the contrary, any staffing issues regarding Kaiser's mental health department could have been, from Brenner's perspective, addressed under the Staffing Article's committee, escalation, and arbitration process.  (Tr. 301:4–302:5.)

**I.    Kaiser's Counterclaim**

443.    Kaiser alleges that the Union failed to meet its obligations under the Patient Care Article by opposing some of the efforts Kaiser undertook during the Transformation, including resisting turning part-time positions into full-time positions, resisting moving employees to different facilities to help cover staffing shortages, and refusing to agree to an alternative benefits proposal to facilitate hiring of additional part-time staff.  (*See* KPF&C ¶ 822.)

444.    In addition to the aforementioned, Kaiser contends that the Union breached the Patient Care Article in two affirmative ways not previously discussed above.

### i.    *"Calling Out Well"*

445.    "Calling out well" means people who call out sick when they are not sick.  (*See* Tr. 500:24–501:3.)

446.    McGill testified the practice of "calling in well" was "very detrimental" to Pharmacy staffing and caused "some chaos" in the ability to backfill.  (Tr. 1187:2–13.)

447.    Dowodzenka admitted to advising two Local 7 pharmacists to call out and say they were unavailable for work when they needed time off.  (Tr. 501:4–502:25.)

448.    On one of these occasions, she advised the employee to call and say that he was unavailable to work when he had to attend a court date after Kaiser denied his time off request for that date.  (Id.)

449.    On another occasion, Dowodzenka advised an employee to call and say he was unavailable to work when Kaiser denied one day of his weeklong out-of-state vacation.  (Id.)

450.    However, Dowodzenka never encouraged the employees to misrepresent the reason for their absence from work.  (Tr. 501:4–25, 502:1–8.)

### ii.    *SBON Complaints*

451.    Between 2019 and 2022, Dowodzenka submitted at least eight formal complaints to the Colorado SBON against Kaiser nursing executives and managers, including against Senior Director of Operations for Perioperative Services Kristen O'Keefe, RN; Senior Director of Operations for Float Pool and Regional Staffing Office Pegah Rownaghi, RN; Vice-President of Care Continuum Cortney Eisses, RN (Acting CNO and Regional Administrator of Medical Specialties at the time complaint was filed); former Chief Nursing Officer ("CNO") Dr. Sara Kollman, RN, Ph.D. (three filed against Dr. Kollman); Regional Director Jessica Weidner; and Population Department Manager Martina Kuhar, RN.  (Ex. D (Kollman Compl. 1); Ex. E (Kollman Compl. 2); Ex. F (Kollman Compl. 3); Ex. B (Eisses Compl.); Ex. J (O'Keefe Compl.); Ex. M (Rownaghi Compl.); KPF&C ¶ 295.)

452.    The SBON ultimately dismissed all complaints filed by Dowodzenka. (KPF&C ¶¶ 310, 315, 327, 341; Exs. C, G, H, I, L, N.)

453.    Dowodzenka testified that she filed the SBON complaints because she was hoping for external intervention and wanted DORA to advise Kaiser to do something differently.  (Tr. 519:4–14.)

454.    Each of the Kaiser nursing executives and managers against whom Dowodzenka filed SBON complaints testified that the complaints caused them to feel

anxious, intimated, bullied, and fearful of the effect of the complaint on their professional licenses and career.  Indeed, the SBON complaints were a significant factor in Kollman's ultimate decision to seek employment elsewhere.  (KPF&C ¶¶ 308, 318, 331, 333, 348, 349.)

455.    The Court finds Dowodzenka's testimony that she did not know whether a SBON complaint is a threat to a nurse's license to be not credible.  (Tr. 540:2–22.)

456.    Dowodzenka admitted that a SBON complaint filed against these Kaiser nursing executives could affect their nursing licensure and could potentially affect their livelihood.  (Tr. 540:10–542:8.)

457.    The Court finds that the testimony of all four nursing executives regarding the SBON complaints lodged against them was "very credible."  (Tr. 1349:19–1350:8.)

458.    The Court accepted "as established[,] the fact that [the SBON] complaints were a threat to [the four nursing executives'] license[s]."  (Tr. 1351:15–23.)

**J.    The Parties' Requested Relief**

459.    The Union asks the Court to:

        a.    Find Kaiser liable for breach of the Patient Care Article;

        b.    Dismiss Kaiser's counterclaim;

        c.    Declare that "[t]he parties' Patient Care Articles are enforceable and are not arbitrable";

        d.    Issue an injunction directing that:

                i.    "Kaiser must hire and retain enough float pool RNs and APPs to cover at least 80% of planned and unplanned leaves of absence, which is also Kaiser's own benchmark";

ii.     "Kaiser must hire and retain enough RNs to handle all patient messages discussing symptoms and respond to all messages in three days or less, which was the benchmark set by Kaiser itself";

iii.    "Kaiser must hire and retain enough therapists and psychologists to provide return appointment access of a maximum of two weeks while increasing its capacity to treat its members with in-house providers as opposed to contracted external providers";

iv.     "Kaiser must hire and retain enough pharmacists so that no clinic has only one pharmacist"; and

v.      "The parties must bargain over appropriate FTE increases in other departments, including Primary Care APPs, larger Pharmacy clinics, and Urgent Care."  (ECF No. 202.)

460.    Kaiser asks the Court to, as a threshold matter, find the parties' claims are arbitrable and dismiss the matter in full for lack of subject-matter jurisdiction.  (KPF&C ¶ 772.)

461.    If the Court declines to find this dispute is arbitrable, Kaiser alternatively asks the Court to find the Patient Care Article is too indefinite to enforce.  (KPF&C ¶ 779.)

462.    Lastly, if the Court finds the parties' claims are not subject to arbitration and the Patient Care Article is enforceable, Kaiser asks the Court to:

a.      Dismiss the Union's breach of contract claim;

b.      Find the Union liable for breach of the Patient Care Article; and

c.      Order the Union to perform its obligations under the Local CBAs, including to: "(1) provide sufficient staffing to meet quality standards of patient care, workload, and other issues affecting patient care, including, but not limited to, ensuring adequate coverage; (2) cease directing employees to call out sick when they are not sick; (3) work collaboratively with Kaiser to turn part-time positions into full-time positions; (4) work collaboratively with Kaiser on proposals related to moving employees to different facilities to cover staffing shortages; and (5) work collaboratively with Kaiser to reach an economically viable solution for the hiring of additional part-time staff." (KPF&C ¶ 824.)

## II. CONCLUSIONS OF LAW

### A.      Legal Standards

463.    The Court has subject matter jurisdiction under 29 U.S.C. § 185 ("Section 301") because this is a lawsuit alleging the violation of CBAs in an industry subject to the NLRA.  *UFCW, Local No. 7 v. King Soopers, Inc.*, 743 F.3d 1310, 1316 (10th Cir. 2014) ("Federal courts have jurisdiction under § 301 over suits that claim a [labor] contract has been violated.") (internal quotations and citations omitted).

464.    Colorado law applies to the interpretation of the Local CBAs because the signatories were based in Colorado and the work at issue has been performed in Colorado.  *See Brent Elec. Co. v. IBEW Local Union No. 584*, 110 F.4th 1196, 1215 (10th Cir. 2024) (applying Oklahoma law for the same reasons).

465.    As a threshold matter, however, the Court must address arbitrability before considering the merits of the parties' contractual claims.  *Id.* at 1211 ("in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims") (quoting *AT&T Techs. v.*

*Commc'ns. Workers of Am.*, 475 U.S. 643, 649 (1986)); *accord Peabody Holding Co., v. UMW*, 665 F.3d 96, 104 (4th Cir. 2012) ("When evaluating arbitrability, we must not accept a party's invitations to critically appraise the merits of the underlying dispute. . . . As the Supreme Court has declared, courts at the arbitrability stage, 'have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.'") (quoting *AT&T Techs.*, 475 U.S. at 650).

466.    If this dispute is subject to arbitration, then the Court will dismiss the case. *See Crawford v. United Servs. Auto. Ass'n Ins.*, 2006 WL 8460352, at *12 (D. Colo. July 7, 2006) ("[t]he weight of authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration" and noting, "in Colorado, a valid and unwaived arbitration clause deprives the court of subject matter jurisdiction until the dispute has been submitted to arbitration" (emphasis in original) (internal quotations and citations omitted)).

467.    In its Order on Defendants' Motion for Summary Judgment, the Court stated that "the Union has a steep hill to climb at trial to differentiate actionable events under the Patient Care Article from those that must be arbitrated under the Staffing Article." (ECF No. 142 at 14.)  Following summary judgment and prior to trial, the Tenth Circuit reemphasized the slope of that hill by holding that a CBA dispute is subject to arbitration when the party opposing arbitration fails to present "the most forceful evidence" that issues covered by an arbitration clause are not subject to arbitration. *Brent Elec.*, 110 F.4th at 1218.

468.    In *Brent Elec.*, the Tenth Circuit expounded on the rule that courts will order arbitration or otherwise decline to adjudicate the merits of a dispute "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id*. at 1211 (quoting *AT&T Techs.,* 475 U.S. at 650).  The Circuit explained that this presumption in favor of arbitration "reconciles the principle that a party cannot be required to submit to arbitration any dispute that he has not agreed so to submit, with the federal policy and presumption favoring arbitration in the labor context."  *Brent Elec.,* 110 F.4th at 1211 (quoting *Int'l Bhd. of Elec. Workers, Loc. No. 111 v. Pub. Serv. Co. of Colo.*, 773 F.3d 1100, 1108 (10th Cir. 2014)).

469.    Courts will apply the presumption when "a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand."  *Brent Elec.,* 110 F.4th at 1212 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)); *see also In re Dittmar*, 618 F.3d 1199, 1206 n.1 (10th Cir. 2010) (noting that ambiguities are more common in CBAs than other contracts).

470.    Under Colorado law, "[a]n ambiguity must appear in the four corners of the document <u>before</u> extrinsic evidence can be considered."  *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 117 (Colo. 2016) (emphasis in original).   "[E]xtrinsic evidence cannot create ambiguity; it is an aid to ascertaining the intent of the parties once an ambiguity is found."  *Id*.  Therefore, the determination of whether the Local CBAs are ambiguous regarding the arbitrability of this dispute must precede any consideration of evidence extrinsic to the Local CBAs.

471.    After an ambiguity has been identified, "the meaning of a provision or term is generally an issue of fact which may be determined by extrinsic evidence pertinent to the transaction, including the parties' conduct under the agreement and their conduct before the controversy arose."  *Puls v. Landmark Cmty. Newspapers, Inc.*, 335 F. App'x 805, 810 (10th Cir. 2009) (applying Colorado law); C.R.S § 4-2-202 (stating that contractual terms "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . [b]y course of dealing, usage of trade, or by course of performance . . . and . . . [b]y evidence of consistent additional terms unless the court finds the record to have been intended also as a complete and exclusive statement of the terms of the agreement."); *see* C.R.S. § 4-1-303 (defining "course of performance, course of dealing, and usage of trade").

472.    In determining whether a CBA is ambiguous regarding arbitrability and whether the party opposing arbitration has presented the most forceful evidence that the dispute is not subject to arbitration, courts consider the substance of the dispute, wary of "obfuscation designed to shepherd an otherwise-arbitrable grievance into court." *Peabody Holding*, 665 F.3d at 104.  Thus, a dispute is subject to arbitration, even if a CBA article implicated by the dispute appears, by its terms, to be *exempt* from arbitration, if the actual dispute is "better understood" to implicate other articles that are subject to arbitration.  *Local 5-857 Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Conoco Inc.*, 320 F.3d 1123, 1126–27 (10th Cir. 2003).

**B.      The Staffing Article Covers This Dispute**

473.    As set forth above, three sequential CBA articles are pertinent to this

dispute: the Resolution/Grievance Procedure Article, the Staffing Article, and the Patient

Care Article.  (*See* Section I.B.ii–iv *infra*.)

474.    Looking to the plain language of these provisions: (a) the Patient Care

Article excludes the arbitration procedures outlined in the Resolution/Grievance

Procedure Article (*see* ECF No. 46) but does not exclude the arbitration procedures of

the Staffing Article, which are separate from the Resolution/Grievance Procedure

Article's procedures; (b) the Patient Care and Staffing Articles have substantial subject-

matter overlap, with both articles containing the language, "The parties recognize their

mutual and ethical responsibility to provide sufficient staffing to meet quality standards

of patient care"; (c) the Staffing Article specifies that its grievance and arbitration

procedure applies to "staffing issues," without restriction; (d) the Patient Care Article

contains no dispute resolution procedures of its own; and (e) the Local CBAs nowhere

indicate that the parties may rely on federal court litigation to resolve disputes.  (*See*

Exs. 1–4.)

475.    Additionally, the Workload Distribution Provisions and LOU 8 further

support the conclusion that the Patient Care Article does not broadly prohibit arbitration.

The Patient Care Article explicitly includes "workload" within its subject-matter and, in

the Workload Distribution Provisions and LOU 8, the Union also agreed that "workload

issues," "Caseload Grievances," and "workload distribution," are all subject to

arbitration.  (*See* Exs. 1 and 2, at LOU-8, LOU-14; Exs. 3 and 4, at Art. 28.)

476.    Taken together, the Court finds that these provisions do not provide the

required "positive assurance" that *this* dispute—pled by the Union as arising under the

Patient Care Article—is not arbitrable as a "staffing issue" under the Staffing Article.
*See Brent Elec. Co.*, 110 F.4th at 1211 (requiring arbitration "unless it may be said with
positive assurance that the arbitration clause is not susceptible of an interpretation that
covers the asserted dispute") (internal quotations, citation and alterations omitted).

477.    Indeed, the Union's requested injunction is consistent with this finding.
The Union seeks an injunction directing that (1) "Kaiser hire and retain enough RNs to
handle all patient messages discussing symptoms and respond to all messages in three
days or less . . . ."; (2) "Kaiser hire and retain enough float pool RNs and APPs to cover
at least 80% of planned and unplanned leaves of absence"; (3) "Kaiser hire and retain
enough therapists and psychologists to provide return appointment access of a
maximum of two weeks while increasing its capacity to treat its members with in-house
providers as opposed to contracted external providers"; (4) "Kaiser hire and retain
enough pharmacists so that no clinic has only one pharmacist"; and (5) "[t]he parties
must bargain over appropriate FTE increases in other departments including Primary
Care APPs, larger Pharmacy clinics, and Urgent Care"  (ECF No. 202.)

478.    In this way, the Union asks the Court to increase staffing levels in
particular departments and thus effectively order that the parties proceed through the
grievance/resolution process outlined in the Staffing Article as to other staffing issues.

479.    The Union argues that the Patient Care Article is uniquely patient-centric
and, thus, this dispute does not implicate other articles.  However, the very plain text of
the Staffing Article contradicts that argument by stating that it too serves "to provide
sufficient staffing *to meet quality standards of patient care*."  (Ex. 1 (emphasis added).)

480.    Because the dispute centers on "sufficient staffing to meet quality standards of patient care," and that subject matter is covered by the Staffing Article's arbitration clause, the Court concludes that the presumption of arbitrability applies.

**C.    The Union Failed to Rebut the Presumption of Arbitrability.**

481.    As a consequence, the Court must order arbitration unless it finds that the Union has rebutted the presumption of arbitrability with "the most forceful evidence of a purpose to exclude the claim from arbitration."  *Brent Elec.*, 110 F.4th at 1212 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584–85 (1960)). The Court finds that it did not.  In fact, in the Court's view the extrinsic evidence confirms that application of the presumption is appropriate in these circumstances.

482.    To determine whether the Union met this high rebuttal bar, the Court weighs the evidence adduced at trial relating to the parties' conduct both under the agreement and before the controversy arose.  *See Puls*, 335 F. App'x at 810.

483.    On the one hand, the Union presented evidence of one dispute brought in federal court under the Patient Care Article that survived a motion to dismiss in favor of arbitration.  The parties settled that suit, and the Union presented no evidence that the court ever ruled that the dispute was not arbitrable *under the Staffing Article*.

484.    On the other hand, Kaiser presented evidence of numerous similar disputes that the parties addressed via the CBAs' grievance and arbitration procedures, many of which specifically referenced the Patient Care Article.  For example, in 2011, the Union filed an arbitrable grievance alleging that Kaiser was "refusing to staff outpatient clinics with adequate number of therapists *to provide safe and appropriate care*."  (Ex. A14 at KP_CPMG_000019, 000021) (emphasis added); *see also* Exs. A25, A27, and A35.)

485.    Brenner and Patke also gave undisputed testimony that the Union previously arbitrated Patient Care Article disputes.  Specifically, Patke acknowledged that Kaiser hired an additional 10 FTE of therapists in response to an arbitration under the Patient Care and Staffing Articles.  (Tr. 1091:11–1092:8, 1094:12–20; *see also* Ex. 18 (logging arbitrable complaints substantially similar to the subject matter of this lawsuit).)

486.    Although the Union argues that the Patient Care Article was uniquely crafted to address systemic staffing issues, Heller admitted that nothing in the Patient Care Article's language suggests that it pertains to systemic staffing issues more so than the Staffing Article does.  (Tr. 681:16–682:14.)  The Union also failed to present any examples of an arbitrator declining to arbitrate a dispute that implicates the Patient Care Article.

487.    Of note, the Union argues that its past practices of resolving similar disputes under the Staffing Article and other arbitration procedures amounted to "scriveners' errors."  (Tr. 1346:1–6 ("When a grievance did cite patient care article language or listed the patient care article as one of the articles that was being filed under, that was effectively a scrivener's error.  Dowodzenka testified that she didn't put very much thought into which articles she was checking or listing in that box.").)

488.    But it was not only Dowodzenka who filed grievances that relied on the Patient Care Article.  Union representative Theresa Smith did so too, and the frequency of this practice precludes the conclusion that it was a minsterial oversight.  (*E.g.*, Exs. 24, 35 ,36, and 47.)

489.    In any event, Dowodzenka in fact testified that staffing issues are arbitrable.  (Tr. 520:2–21.)

490.    On this point the Court easily concludes that the Union's "scrivener's errors" argument does not constitute "the most forceful evidence," especially in the absence of contemporaneous recognition of, or efforts to correct, these alleged errors.

491.    From all this it should be manifest that the presumption of arbitrability applies even more clearly in this case than it did in *Local 5-857 Paper*, where an employer claimed that a dispute was not subject to arbitration because it arose under a CBA article stating that grievances arising under it "cannot be submitted to arbitration; and no arbiter has the authority to rule on [this article]."  *Local 5-857 Paper*, 320 F.3d at 1124 n.2, 1127 (affirming district court order to compel arbitration).  That language is significantly more anti-arbitration than the Patient Care Article at issue here, yet it was unavailing in the face of other Local CBA provisions that required arbitration and that also covered the dispute.

492.    Here, the Court concludes the Union did not present the most forceful evidence that this dispute could not be resolved as a staffing issue, under the Staffing Article, which is expressly concerned with "sufficient staffing to meet quality standards of patient care."

493.    Like in *Local 5-857 Paper*, and consistent with the parties' history of arbitrating similar disputes, the dispute here implicates Local CBA articles with arbitration procedures.

494.    Accordingly, the Court dismisses this matter because the disputes arising herein are fully subject to arbitration.

### III. RULE 52(C) MOTIONS

Federal Rule of Civil Procedure 52(c) provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party."  Fed. R. Civ. P. 52(c). Judgment under Rule 52(c) must be supported by findings of fact and conclusions of law as required by Rule 52(a).  *Id.*

At the close of the Union's case, Defendants made an oral motion pursuant to Rule 52(c) ("Rule 52(c) Motion").  (Tr. 688:1–702:15.)  The Court took Defendants' Rule 52(c) Motion under advisement.  (*Id.* at 702:16–19.)  Defendants renewed their Rule 52(c) Motion.  (*Id.* 1329:7–21.)  At the end of the trial, Plaintiff also made a Rule 52(c) motion as to Defendants' counterclaim ("Plaintiff's Rule 52(c) Motion").  (*Id.* 1314:24– 1328:24.)  The Court took Plaintiff's Rule 52(c) Motion under advisement.  (*Id.* at 1328:25–1329:2.)

The Court now rules on these oral motions: Defendants' Rule 52(c) Motion, and as renewed, and Plaintiff's Rule 52(c) Motion are denied as moot consistent with the foregoing findings of fact and conclusions of law entered after a full trial on the merits to the Court.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.      Both parties' Rule 52(c) Motions are DENIED AS MOOT, as set forth

above;

2.      The Court FINDS and CONCLUDES that both parties' breach of contract

claims are arbitrable pursuant to the Local CBAs;

3.      This action is accordingly DISMISSED WITHOUT PREJUDICE; and

4.      The Clerk shall terminate this action, each party to bear its own attorney's

fees and costs.

Dated this 27th day of May, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge